FILED

07/14/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0409

DA 23-0409

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 150

STATE OF MONTANA,

Plaintiff and Appellee,

v.

KATHERINE ANNE PROCTOR,

Defendant and Appellant.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2022-30
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Alexander H. Pyle, Assistant Public Defender, Office of the State
Public Defender, Lewistown, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Cori Losing, Assistant
Attorney General, Helena, Montana

Kevin Downs, Lewis and Clark County Attorney, Mary Barry,
Deputy County Attorney, Helena, Montana

For Amici The American Civil Liberties Union and The ACLU of Montana:

Alex Rate, ACLU of Montana Foundation Inc., Missoula, Montana

For Amicus The Innocence Network:

Karl Pitcher, Attorney at Law, Missoula, Montana

Submitted on Briefs: November 5, 2025

Decided:  July 14, 2026

Filed:

_____
                Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court

¶1     Katherine Anne Proctor (Proctor) appeals her June 9, 2023 conviction for felony Assault on a Minor, in violation of § 45-5-212, MCA, entered in the First Judicial District Court, Lewis & Clark County.  We affirm.

¶2     We restate the issues on appeal as follows:

*Issue One: Whether the District Court erred in admitting expert testimony related to "Shaken Baby Syndrome."*

*Issue Two: Whether the District Court erred by not suppressing evidence obtained under an impermissible general warrant.*

*Issue Three: Whether the prosecutor violated Proctor's right to a fair trial with impermissible statements related to Proctor's character.*

*Issue Four: Whether Proctor's counsel was ineffective.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     P.P. was born in May 2021 and was healthy.  At the time, Proctor was an Assistant Attorney General and P.P.'s father, Tim Proctor, was an officer with the Montana Highway Patrol.  Proctor and Tim diligently participated in routine neonatal care for P.P.  The family relied on an Owlet baby monitor integrated into a sock (Owlet) to track P.P.'s heart rate and oxygen levels at night.  The family was then living in Helena, Montana, but were preparing to move to Choteau, Montana, for Tim's job in August 2021.  With Proctor primarily caring for P.P. in Helena, Tim began residing in the family's new residence while returning regularly to assist Proctor.  Unbeknownst to Proctor, Tim was engaged in an extramarital affair at this time.  Proctor and Tim prepared to sell their house in Helena, with closing scheduled for September 29, 2021.  However, Proctor could not immediately

3

move into the new Choteau home until her employer approved her to work remotely. Instead, Proctor would temporarily move into an apartment in Helena with P.P. Proctor enrolled P.P. with 3Rs Daycare (3Rs) in August 2021 so that she could return to work. Proctor also relied on extended family for supplemental childcare.

¶4 On September 7 and 9, 2021, workers at 3Rs noted P.P. had dime-sized bruises on her cheekbones and forehead when she arrived. P.P. arrived at day care with an abrasion on her nose on September 13, 2021. Tim took care of P.P. when she was sick with COVID-19 on September 20-23, 2021, and thereafter returned to Choteau. When Tim left, P.P. did not have a black eye. The next day, Proctor watched P.P. Tim returned to Helena on September 25, 2021, and noticed P.P.'s black eye, which Proctor claimed was the result of dropping a toy on herself. Two separate workers at 3Rs later testified about having seen P.P.'s black eye on September 27, 2021. The second worker was skeptical of Proctor's proffered explanation because she had not seen P.P. demonstrate the dexterity required to grasp a toy in such a manner.

¶5 Tim returned to Helena on September 28, 2021, to assist Proctor in the final steps of vacating the Helena house. He picked up P.P. from 3Rs that evening and fed her a bottle at approximately 6:30 p.m. before leaving her on a blanket on the floor to continue packing the home with Proctor. Major Dustin Lerette (Lerette), one of Tim's coworkers, arrived at around 7:45 p.m. and spoke with Tim. Lerette had a brief interaction with Proctor, who appeared "stressed." Additionally, Lerette heard music and P.P. crying from inside the house. After Lerette left, Tim went back inside the house and found P.P. was asleep—not on the ground where he had last seen her—but in her car seat. Proctor remained packing

4

at the house and Tim took P.P. to the apartment for the night. Once there, Tim prepped P.P. for sleep, "put[ting] her pajamas on, chang[ing] her diaper[,]" and "warm[ing] up her bottle." "The entire time[,]" P.P was asleep, only waking up "[a] little bit" for her evening bottle, of which she only consumed between "five and ten [milliliters]." P.P. usually consumed 125 milliliters. Tim woke at 1:30 a.m. on September 29, 2021, after hearing a noise. He checked on P.P., who remained asleep even after Tim picked her up.

¶6     At 6:00 a.m. on September 29, 2021, Proctor began readying P.P.'s morning bottle. P.P would not wake up. Data from the Owlet, worn by P.P. overnight, showed her heart rate had dropped to between 60 and 70 beats per minute (bpm). A typical four-month-old should register at least 100 bpm. The parents were concerned about possible seizure activity, as they noticed one side of P.P.'s body was twitching. Proctor called P.P.'s pediatrician, who advised bringing P.P. to the emergency room.

¶7     At the emergency room in Helena, medical personnel reacted quickly on P.P.'s arrival shortly after 7:00 a.m. because she was obviously "critically ill." P.P. had a bruise on her right eyelid. Due to P.P.'s moist mucous membranes, emergency room Dr. Andy Coil (Dr. Coil) ruled out dehydration. Although P.P.'s heart rate and oxygen were initially normal, her oxygen levels dropped shortly after her arrival, necessitating supplemental oxygen. Her temperature was low. P.P was less responsive than she should have been at four-months-old.

¶8     Dr. Coil conducted a head-to-toe exam and found P.P.'s anterior fontanelle, the "top front part of [her] skull[,]" was "tense and bulging a little bit." The swelling of P.P.'s anterior fontanelle, which should have been "normally soft and somewhat squishy" at

5

P.P.'s stage of development, indicated pressure on the brain. Dr. Coil stepped out of the room to order a computed tomography (CT) scan of the brain. When Dr. Coil returned, P.P. was actively seizing. The CT scan indicated P.P. had suffered "a large, massive anoxic brain injury." Given the severity of the brain injury, Dr. Coil decided to transfer P.P. to another hospital capable of providing "pediatric neurosurgery, [. . .] pediatric neurology, and a pediatric intensivist" as required by P.P.'s dire situation but which was unavailable in Helena. P.P. spent five hours in the Helena emergency room before being transported by helicopter with Proctor to the children's hospital in Kalispell, Montana. In preparation for the flight, Dr. Coil and staff placed P.P. in a "medically induced coma" and intubated her to "put her on life support to breathe" during transport.[1] Dr. Coil indicated he would not have been surprised if P.P. died due to the severity of her injuries.

¶9 Dr. Nicholas Satovick (Dr. Satovick), a neuroradiologist who contracted with the hospital in Kalispell, reviewed P.P.'s CT scan from the Helena hospital. He found the scan reflected P.P. had "a small subdural hemorrhage" on the left side of her brain, a "linear focus of blood in the right lower cerebellum," and a "profound [. . .] decreased attenuation of the cerebral hemispheres of the brain on both sides." The latter diagnosis was determined because, rather than showing a "differentiation of gray and white matter" in P.P.'s brain, the scans reflected "all one shade of grey" indicating an injury such as "loss of blood flow or oxygen to the brain." Dr. Satovick agreed with Dr. Coil that the CT scan

---

[1] Medical staff made one unsuccessful attempt to intubate P.P. before completing the procedure. No evidence suggested P.P. had suffered any physical injury from the first failed attempt.

indicated P.P. had experienced a "hypoxic ischemic event" in which brain injuries were caused by reduced oxygen and blood flow.

¶10 When P.P. and Proctor arrived in Kalispell, Dr. Timothy Stidham (Dr. Stidham) ordered a Magnetic Resonance Imaging (MRI) scan of P.P.'s brain, a chest x-ray to check the intubation, and a blood test. The blood test ruled out a Sudden Infant Death Syndrome event. P.P. tested positive for the common cold but was not displaying any symptoms. She tested negative for COVID-19, influenza, and respiratory syncytial virus. P.P. began seizing again after metabolizing the antiseizure drugs administered before her flight to Kalispell. Dr. Stidham restabilized P.P.

¶11 The CT scan confirmed significant swelling on the brain as well as significant portions of her brain that were without oxygen long enough that she was going to have irreversible, significant injury. Dr. Stidham decided against surgery on the brain because all sides of the brain were affected, thus negating any benefit from emergency surgery. The MRI showed P.P. had a cervical ligamentous injury but no spinal cord injury in her neck. The subdural bleeding between the brain and the skull was more evident on the MRI than it appeared on the CT scan conducted in Helena. Dr. Stidham put a C-collar on P.P. to stabilize her neck ligaments and protect her spine.

¶12 Dr. Stidham asked Proctor about the bruising on P.P.'s face. He was skeptical of Proctor's explanation that P.P. had dropped a toy on herself because "it's kind of hard for four-months-olds to bruise their face and [. . .] bring [a] toy to her face with enough force to cause a bruise[.]" Dr. Stidham testified that "any bruising without a very consistent mechanism is a concern for [. . .] some type of child abuse[,]" especially in conjunction

7

with the x-ray imaging, which revealed multiple rib fractures. Dr. Stidham began to suspect P.P.'s injuries resulted from trauma, specifically non-accidental trauma or abusive trauma. He indicated the fractures were more important than the history of a mechanism for the bruises on P.P's face, and his leading diagnosis was "non-accidental trauma" (NAT). On September 30, 2021, Dr. Stidham conducted a skeletal survey, which confirmed the rib fractures and a femur fracture. The fractures were in various stages of healing, suggestive of "different time points of different abusive injuries to [P.P.]" Dr. Stidham further opined the rib fractures and P.P.'s brain injuries suggested a diagnosis of NAT caused by inflicted abuse.

¶13 P.P.'s arrival presented a fast-moving medical situation to doctors in Kalispell, but Dr. Stidham managed to keep Proctor and Tim apprised of developments. On September 29, he first told the parents that P.P.'s injuries resembled "inflicted injuries." Neither parent could provide Dr. Stidham with any history that could explain P.P.'s injuries and P.P. had no history of any significant trauma. Confronted with Dr. Stidham's suspicions, Tim vomited. Proctor remained focused on the timing of P.P.'s injuries.

¶14 On October 1, 2021, Dr. Mark Remington (Dr. Remington), an ophthalmologist in Kalispell, examined P.P.'s right eye.[2] Dr. Remington found extensive hemorrhages in the retina and "significant macular edema[,]" or swelling in the retina. When Dr. Remington conducted a second exam on October 19, 2021, he was able to examine both of P.P.'s eyes.

---

[2] Dr. Remington only dilated P.P.'s right eye, keeping her left eye undisturbed so nurses could continue checking for a sudden increase in pressure on the brain, a symptom of which is a dilated pupil, due to a persisting intracranial hemorrhage.

The hemorrhages were clearing in P.P.'s right eye as expected, but he also discovered retinoschisis, or a splitting of the retina, as well as hemorrhages in the left eye.

¶15   Dr. Kelly Schmidt (Dr. Schmidt), a specialist in pediatric neurosurgery, also treated P.P.  On October 6, 2021, Dr. Schmidt ordered another MRI, which showed a tearing of the arachnoid, a thin membrane connecting the brain to the skull.  Blood from this tear mixed with brain fluid into P.P.'s subarachnoid space.  P.P. could not reabsorb the fluid, which had begun to accumulate and cause pressure against P.P.'s skull in the week after she first entered the Kalispell hospital.  According to Dr. Schmidt, this was a "classic" scenario in abuse cases: a patient would enter the hospital with a tear on this layer of the brain and, "anywhere from one to sometimes weeks later[,]" fluid would then accumulate within the brain.

¶16   Dr. Schmidt testified to child abuse protocols wherein doctors will examine both the brain and the spine.  Because infants have weaker neck muscles, cases of "abusive head trauma or shaken baby" can lead to injury of the cervical spine.  Babies "very rarely have bony injur[ies,]" and instead they "tend to have injury more to soft tissue and to ligaments."  The MRI of P.P.'s neck showed fluid in the joints of her neck at the base of her skull, indicating a disruption of those joints.  According to Dr. Schmidt, this injury can only be caused by shaking a baby.  As for a prognosis for P.P., Dr. Schmidt could only offer to Proctor and Tim that P.P.'s brain had been "irreversibly injured."  She emphasized the severity of P.P.'s brain injury.  Further, she opined to them that P.P. "had been abused[.]"  Proctor again questioned the timeline of P.P.'s injuries, a response Dr. Schmidt found

9

"unusual" given the severity of P.P.'s immediate situation and the rapid pace of treatment decisions.

¶17 Nine days after P.P.'s arrival in Kalispell, Dr. Schmidt relieved the continued-pressure on her brain by draining the fluid. After a couple days, the laceration healed and the tube was removed. However, P.P.'s recovery was limited to the abatement of more immediate dangers from her injuries; Dr. Schmidt opined that P.P. would require full-time care for the rest of her life and be unable to function independently in the world. P.P.'s brain injury liquified her brain and the injured areas were "replaced by the normal brain fluid," leaving her with large portions of "just nonfunctioning brain." P.P. was missing the vision-processing structures and the balance center in the cerebellum due to strokes she had been having. Dr. Schmidt was consistent in her diagnosis that P.P.'s brain injury was caused by non-accidental trauma, discounting a competing theory ascribing cause to a "venous clot" because the "strokes weren't venous" since the issue was that "the brain didn't get enough oxygenated blood from the arteries[,]" not an issue of the veins inability to drain blood away from the brain. Dr. Schmidt described that the result resembled "a near drowning."

**Criminal Investigation**

¶18 On September 29, Proctor called 3Rs to explain P.P.'s absence from daycare. P.P. had last attended on September 28, when staff noticed the bruises under P.P.'s eyes. At the time, a staff member asked Proctor about the injuries, which were blamed on dropping a toy. When Tim arrived to pick up P.P. that evening, he offered the same explanation. Out of concern for the bruising, 3Rs's owner, Susan Anderson (Anderson) reviewed the

staff logbooks and discovered "a pattern of injuries" staff had noticed and kept a record of during P.P.'s attendance. In addition to the black eye, the pattern included an alleged "rug burn" on P.P.'s nose documented on September 13, 2021 and two additional bruises on September 7 and 9. On September 28, staff met to discuss P.P. and decided to report the pattern of injuries to Child Protective Services (CPS), which Anderson did on September 29.[3]

¶19 Led by Detective Joshua Van Dyke (Van Dyke) of the Lewis & Clark Sheriff's Office, the State began investigating the abuse of P.P. the same day. Van Dyke informed Tim of the investigation. Van Dyke seized two smartphones belonging to Proctor and Tim pursuant to a search warrant obtained on October 15, 2021. He applied for a second warrant to search the devices, which was granted on October 28, 2021. The warrant application alleged aggravated assault as probable cause and requested "[a]ll data currently stored in or related to the account or device identified herein related to the crimes or offenses identified herein[.]" This included location data, internet browsing history, media files, and any correspondence on the devices. Van Dyke averred "[c]riminals will often use [. . .] wireless communication methods to facilitate their crimes" but did not specify how wireless communication may have facilitated the alleged abuse of P.P. The warrant application sought cell phone information due to the parents' use of the companion smartphone application for the Owlet monitor and further noted that, according to CPS

---

[3] While in the Natal Intensive Care Unit, Proctor nicked P.P.'s finger with nail clippers, which should not be used on a child P.P.'s age. There were further concerns about the possibility of the wound becoming infected within the hospital environment. A hospital social worker reported this incident to CPS in addition to the report made by the day care.

worker Jennifer Blodgett (Blodgett), both Proctor and Tim were "on their phones for a significant amount of time following news of physical abuse to P.P." At the suppression hearing, Van Dyke testified that Blodget confirmed the parents' smartphone use to him; however Blodgett testified that she could not recall saying the same to Van Dyke.

¶20 The warrant granted the extraction of "all data currently stored" on the parents' smartphones, with the exception of communications with legal counsel and clergy, as well as any information the parties stipulated to protecting. The data sought encompassed but was "not limited to" location history, internet activity, multimedia, metadata, and correspondence through associated applications. Proctor moved to suppress evidence obtained by this search warrant on the basis the warrant was overbroad. The District Court denied this motion, concluding the temporal limitations provided specificity and the data seized did not include "anything other than evidence related to the Owlet monitor, photos of P.P., and messages referencing P.P. or injuries to P.P."

**Criminal Charges and Trial**

¶21 The State filed an Amended Information on September 28, 2022, charging Proctor with Assault on a Minor, a felony in violation of § 45-5-212, MCA, alleged to have occurred between June 28, 2021 until October 13, 2021.[4] Proctor, the State alleged, had been overwhelmed by balancing working and caring for P.P. with Tim largely absent.

---

[4] The original Information, filed on January 24, 2022, charged Proctor with one count of Aggravated Assault and one count in the alternative of Accountability for Aggravated Assault.

¶22    On March 4, 2022, Proctor moved to exclude testimony related to a series of diagnoses typically referred to as "shaken baby syndrome" (SBS), arguing SBS is based on insufficiently supported scientific evidence and its admission would be far more prejudicial than probative.  The District Court held a hearing on the matter on August 26, 2022.

¶23    The State presented Dr. Kathryn Wells (Dr. Wells), a board-certified child abuse pediatrician, as their expert on NAT.  She explained NAT, as a diagnosis, has been referred to by various names, including SBS and "Abusive Head Trauma" (AHT).  Dr. Wells testified to the history of NAT, in addition to the controversies surrounding the diagnosis, particularly when referred to by different diagnostic names.  Speaking to the more "colloquial term" of SBS, Dr. Wells noted that an SBS diagnosis does not result from a series of tests, but instead refers to a "constellation of medical findings."  Shaking "may be a component of [. . .] the mechanism that caused the injuries[,]" but the actual breadth of findings was more accurately captured by the terms AHT/NAT.[5]  Dr. Wells herself did not use SBS in her reports.  Nevertheless, Dr. Wells testified that none of the major medical associations—namely the "American Medical Association, American Academy of Pediatrics, the radio graphic associations, the neurological associations"—disputed the validity of AHT as a medical diagnosis.  AHT, according to Dr. Wells, presented a legal controversy, not a medical one.

---

[5] AHT and NAT were used interchangeably by Dr. Wells.

¶24 According to Dr. Wells, a doctor would arrive at an NAT diagnosis like any other: physical examinations of the patient, imaging, laboratory results, and the patient's medical history, ruling out competing causes through a "differential diagnosis." Dr. Wells explained the process of making a differential diagnosis: doctors begin with "a large list of things that may be a cause for a certain presentation" and narrow the list of possible causes as further tests are administered and doctors can interpret those results.

¶25 Helena doctors triaging P.P. initially diagnosed her with seizures, lack of oxygen, and brain injuries, which Dr. Wells opined was commensurate with the process of securing a differential diagnosis. Once P.P. transferred to Kalispell, treating doctors continued assessing her condition through blood tests, which eliminated a bleeding disorder as a possible cause for her condition, and administered further tests. A doctor arrives at a diagnosis based on what is assessed, and does not "speak to who did what" or the issue of culpability. Dr. Wells opined P.P.'s injuries were caused by "acceleration/deceleration" and "rotational inertial forces" due to the nonimpact type of injuries presented. P.P. had the triad of AHT injuries: retinal hemorrhages, brain bleeding, and brain swelling, consistent with acceleration/deceleration potentially caused by nonimpact or impact into a soft surface. However, she also had a brain contusion, a neck injury, and healing rib fractures consistent with squeezing or grabbing of the chest. Importantly, if only the triad was present, Dr. Wells would require further information to diagnose NAT. Taking the sum of all of P.P.'s symptoms and eliminating an infection, bleeding problem, or other underlying disorder through the differential diagnosis, Dr. Wells agreed P.P. had been abused.

14

¶26 Discussion on NAT testimony continued at a September 20, 2022 hearing. Proctor presented testimony from Dr. John Galiznik to argue that a diagnosis of NAT based on retinal hemorrhages, brain bleeding, and brain swelling alone was unreliable without a differential diagnosis. The District Court then issued an oral order denying Proctor's motion to exclude, concluding that, although a diagnosis based on that specific triad alone may not be reliable and "you have to have more to get [to an NAT diagnosis.]" The court was satisfied that an NAT diagnosis could be made on the evidence presented of the other injuries beyond the triad. The District Court concluded the method of diagnosing NAT was reliable and the experts were qualified to speak to that method. Thus, the State could present to the jury at trial evidence from expert witnesses and P.P.'s treating physicians on how, through the differential diagnosis process, medical staff arrived at an NAT diagnosis.

¶27 Trial began on December 5, 2022. The doctors who treated P.P. testified. The State presented Dr. Wells and Dr. Logan Dance (Dr. Dance), a radiologist, as experts. Dr. Dance opined that P.P. would have died from her brain injury if her skull had been fully fused and not been able to expand with the swelling of her brain. His analysis of P.P.'s imaging was not "diagnostic of abuse," but rather fit with the mechanism of "severe noncontact shaking" resulting in bruising of the brain, a highly specific injury in cases of NAT not present in children accidentally injured in, for example, a car accident. As for P.P.'s neck injuries, Dr. Dance believed the fluid between the joints of the top two vertebrae at the base of her skull visible in the MRI scans indicated a loss of integrity to the connection between these bones consistent with deceleration and acceleration. P.P.'s femur fractures, according to Dr. Wells, most specifically suggested she had been abused, either through "really violent

15

shaking" or "just a yank" on her leg exerting significant force causing the end of the bone to separate from the growth plate.

¶28 Dr. Wells testified that the cartilaginous quality of infant rib bones renders them more difficult to fracture, requiring compression "front to back" or a "bending or fulcruming" force on the bones and suggesting a squeezing of P.P.'s ribs in conjunction with a shaking mechanism. For these reasons, Dr. Wells found the fractured ribs indicated abuse. As for the severe brain injury P.P. presented with on arrival at the Helena hospital, Dr. Wells and Dr. Dance agreed P.P. had been immediately injured sometime after her last "normal interaction[.]" This timeline suggested P.P. endured the most acute injury between the time Lerette conferred with Tim at 7:45 p.m. on September 28, 2021, when P.P. had been observed crying, and when Tim began to notice P.P.'s lethargy later that night.

¶29 Proctor's experts testified to perceived deficiencies in the differential diagnosis and alternative interpretations of testing results. A clot in P.P.'s sagittal sinus vein, Dr. Julie Mack (Dr. Mack) and Dr. Joseph Scheller (Dr. Scheller) both opined, could have also caused P.P.'s brain injury but medical staff had not pursued a Magnetic Resonance Venography. The State countered this with Dr. Wells' testimony that she had rarely encountered a sagittal vein clot and in those instances the clot resulted from abuse. Dr. Mack noted P.P.'s cerebellum laceration might have actually been a cerebellar cleft and thus the fluid in P.P.'s cerebellum was not caused by acceleration and deceleration. Dr. Scheller opined the fluid was caused by the failed intubation attempt, an assertion Dr. Coil, who had performed that procedure, categorically denied.

16

¶30 As for the rib and femur fractures, Proctor's expert disagreed with the State's experts. Pediatric orthopedic surgeon Dr. Christopher Sullivan (Dr. Sullivan) believed the rib fractures were older and possibly caused during birth. Dr. Sullivan would have treated P.P.'s femur fractures through reconstructive surgery to reset her pelvis and then allowed the bones to heal in a body cast, a treatment plan Dr. Wells disagreed with because the fractures had occurred where the bone met cartilage and thus could heal on their own. Dr. Sullivan also posited that P.P. had rickets caused by a Vitamin D deficiency leading to brittle bones and Kalispell doctors had not tested for her Vitamin D levels. Dr. Dance did not find evidence of rickets in his review of P.P.'s imaging.

¶31 Evidence obtained from Proctor's cell phone was also admitted. Van Dyke testified that data seized included Proctor's use of the Pinterest application contemporaneously to P.P.'s time in the hospital, Proctor's searches for defense counsel while P.P. was in the hospital, photographs of P.P. showing bruises and abrasions, and some correspondence with Tim. The latter consisted of a photo of P.P. and an accompanying message that she was "doing great" and a photo of P.P. outside. Other than noting he found her phone use incongruent with the severity of P.P.'s ordeal, Van Dyke did not elaborate any further on the meaning of Proctor's phone activity.

¶32 At closing, the prosecutor reiterated the State's theory of the case. She imagined Proctor's predicament on the evening of September 28: extrapolating the pressures of being a new mom largely without Tim, the exhaustion of moving, and the anxiety clouding her ability to continue in her career if not approved for remote work. The prosecutor summarized P.P.'s life beginning at 7:00 a.m. on September 28 until she arrived at the

hospital in Helena at 7:00 a.m. on September 29: P.P. healthy despite a bruised eye at 3Rs; Tim bringing her home and giving her a bottle that evening; P.P. crying while her parents finished packing; P.P. quiet after Tim spoke to LeRette; P.P. consuming only some of her evening bottle; P.P. unresponsive at 1:00 a.m. when Tim picked her up, and finally her alarming condition on the morning of September 29. The prosecutor reminded the jury that P.P.'s injuries were caused not by one instance of violent shaking, although that appeared to cause the most significant brain injury. Rather, the prosecutor delineated, P.P. had experienced numerous fractures and bruising over an extended period of time.

¶33 The prosecutor then characterized Proctor's behavior once P.P. had been admitted to the hospital. She first noted her preparation for the case as indicative of her own diligent character because "when people are under pressure [. . . ] their character really comes out." This stood in contrast with Proctor's text messages to Tim wherein she said the intubated-P.P. was "doing great" rather than focusing on P.P.'s predicament. The prosecutor cast aspersions on Proctor for using her phone to search for criminal defense attorneys instead of researching the complex medical terminology presented from P.P.'s doctors.

¶34 The jury returned a verdict finding Proctor guilty of assault on a minor. Proctor moved for a new trial, which the court denied on April 3, 2023. On June 9, 2023, the court sentenced Proctor to 20 years in the Montana Women's Prison. Proctor now appeals.

## STANDARDS OF REVIEW

¶35 We review evidentiary rulings for an abuse of discretion. *State v. Pelletier*, 2020 MT 249, ¶ 12, 401 Mont. 454, 473 P.3d 991 (citations omitted). A court abuses its

18

discretion when it is based on a clearly erroneous finding of fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice. *Pelletier*, ¶ 12 (citation omitted).

¶36 Whether or not a search warrant was overbroad is a legal conclusion which we review de novo. *State v. Graham*, 2004 MT 385, ¶ 11, 325 Mont. 110, 103 P.3d 1073.

¶37 Generally, this Court will not address issues of prosecutorial misconduct pertaining to a prosecutor's statements not objected to at trial. *State v. Haithcox*, 2019 MT 201, ¶ 23, 397 Mont. 103, 447 P.3d 452; *see also State v. Devereaux*, 2022 MT 130, ¶ 21, 409 Mont. 177, 512 P.3d 1198; *State v. Miller*, 2022 MT 92, ¶ 10, 408 Mont. 316, 510 P.3d 17 (failure to contemporaneously object to an asserted error generally constitutes a waiver of the right to seek appellate review). However, this Court, in our discretion, may review an unpreserved assertion of error under the common law plain error doctrine. *Devereaux*, ¶ 21; *Miller*, ¶ 10.

¶38 Claims of ineffective assistance of counsel present mixed questions of law and fact which this Court reviews de novo. *State v. Weber*, 2016 MT 138, ¶ 11, 383 Mont. 508, 373 P.3d 26.

## DISCUSSION

¶39 *Issue One: Whether the District Court erred in admitting expert testimony related to "Shaken Baby Syndrome."*

¶40 On appeal, Proctor argues the reasoning and methodology supporting SBS is not scientifically reliable or accurate and that recent modeling has not validated the hypothesis.

19

Moreover, she argues that P.P.'s case presents a non-impact mechanism and that the State had not adequately demonstrated the reliability of non-impact biomechanical principles of an SBS diagnosis. The State counters that her argument only obliquely captures the prosecution's theory of the case, which relied on a diagnosis of NAT resulting from several possible mechanisms, including shaking P.P., and manifested in multiple severe injuries, including rib and femur fractures and injuries to her neck, indicating conduct beyond the classical non-impact SBS hypothesis.

¶41 Proctor and amicus, the Montana Innocence Project, rely on a New Jersey case to cast doubt on the reliability of an SBS diagnosis. There, the court held that the SBS hypothesis, also referred to as AHT, was unreliable due to a "lack of biomedical support[.]" *New Jersey v. Nieves* (*Nieves I*), 302 A.3d 595, 620 (N.J. Super. Ct. App. Div. 2023). The trial court barred the admission of expert testimony related to SBS/AHT in two separate criminal prosecutions and the state appealed. *Nieves I*, 302 A.3d at 599. In a consolidated appeal, the Appellate Division of the New Jersey Superior Court affirmed both decisions on the basis that, although the pediatric medical community accepted the validity of SBS/AHT, the theory itself "integrates multiple scientific disciplines" and thus its admissibility required the proponent of SBS/AHT to "establish cross-disciplinary validation to establish reliability." *Nieves I*, 302 A.3d at 599. The expert testimony presented at the preliminary evidentiary hearings provided only a consensus of the existing "controversy surrounding the theory that the biomechanical principles underlying SBS/AHT actually supported the conclusion that shaking only can cause injuries associated with SBS/AHT." *Nieves I*, 302 A.3d at 599. The specific "triad of symptoms" supporting

20

an SBS/AHT diagnosis included subdural hemorrhages, severe retinal hemorrhages, and encephalopathy, but these alone were "not diagnostic"; rather, "the combination of findings, in the absence of pathology," provides the final diagnosis. *Nieves I*, 302 A.3d at 603.

¶42 The New Jersey Supreme Court affirmed this decision, holding that the expert testimony failed the general acceptance standard established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).[6] *State v. Nieves* (*Nieves II*), 345 A.3d 1127, 1132 (N.J. 2025). The *Frye* standard requires expert testimony "not only be reliable, but its proponent must establish that the information to which the expert will testify is generally accepted in the relevant community to which the expertise belongs." *Nieves II*, 345 A.3d at 1132. The defense experts in one of the underlying prosecutions evaluated on appeal "emphasized [the] lack of general acceptance of SBS/AHT" across relevant scientific disciplines. *Nieves II*, 345 A.3d at 1170. Thus, evidence of acceptance by the medical community notwithstanding, the State had "not met its burden of establishing general acceptance [of SBS/AHT] in the relevant scientific communities because the research, studies, and testimony presented at the [*Frye*] hearing reflect a lack of general acceptance by many in the biomechanical community regarding SBS/AHT without impact." *Nieves II*, 345 A.3d at 1171-72.

¶43 However, Montana rejected the "general acceptance rule" aspect of the *Frye* test more than four decades ago because it no longer conformed "with the spirit of the new

---

[6] New Jersey has since abandoned the *Frye* standard. *Nieves II*, 345 A.3d at 1132 n.1 (citing *New Jersey v. Olenowski*, 289 A.3d 456, 459 (N.J. 2023)).

rules of evidence." *Barmeyer v. Mont. Power Co.*, 202 Mont. 185, 193, 657 P.2d 594, 598 (1983) (citations omitted), *overruled on other grounds Martel v. Mont. Power Co*, 231 Mont. 96, 103, 752 P.2d 140, 145 (1988). "'Absolute certainty of result or unanimity of scientific opinion is not required for admissibility.'" *Barmeyer*, 202 Mont. at 193, 657 P.2d at 598 (quoting *United States v. Baller*, 519 F.2d 463, 466 (4th Cir. 1975)). Granted, scientific advancements must have their "'first day in court [. . .] [a]nd court records are full of the conflicting opinions of doctors, engineers, and accountants, to name just a few of the legions of expert witnesses . . . [but] . . . [u]nless an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury, it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.'" *Barmeyer*, 202 Mont. at 193-94, 657 P.2d at 598 (quoting *Baller*, 519 F.2d at 466). Cross-examination is "the shield to guard against unwarranted opinions[.]" *Barmeyer*, 202 Mont. at 194, 657 P.2d at 598-99 (citation omitted).

¶44   Generally, all relevant evidence is admissible. *State v. Santoro*, 2024 MT 136, ¶ 19, 417 Mont. 92, 551 P.3d 822 (citing M. R. Evid. 402). Montana Rules of Evidence 701-705 additionally govern the admission of opinion and expert testimony. *Santoro*, ¶ 19. Rule 702 provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The clause "or otherwise[,]" in the context of Rule 702, refers to testimony provided by an expert witness not necessarily "in the form of opinion,

22

but which informs the jury so they may render the correct decision." M. R. Evid. 702, Commission Comments; *State v. Jay*, 2013 MT 79, ¶ 27, 369 Mont. 332, 298 P.3d 396; *State v. Cassill*, 70 Mont. 433, 448, 227 P. 49, 55 (1924). "To restate this rule, *if* a reliable field helps the trier of fact, *and* the court deems the witness qualified as an expert, *then* he may testify." *State v. Clifford*, 2005 MT 219, ¶ 33, 328 Mont. 300, 121 P.3d 489 (emphasis in original). This Court has repeatedly stated the test for admissibility of expert testimony is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact at issue. *Santoro*, ¶ 20 (citing *State v. Ayers*, 2003 MT 114, ¶ 36, 315 Mont. 395, 68 P.3d 768; *State v. Southern*, 1999 MT 94, ¶ 49, 294 Mont. 225, 980 P.2d 3).

¶45 "Questions concerning expert testimony's reliability are threefold under [Rule 702]: (1) whether the expert field is reliable, (2) whether the expert is qualified, and (3) whether the qualified expert reliably applied the reliable field to the facts." *Clifford*, ¶ 28. First, the trial court must determine whether the subject matter of the testimony is one that requires expert testimony. *Santoro*, ¶ 20; *Ayers*, ¶ 36; *Southern*, ¶ 49. Second, the court must determine whether the particular witness is qualified as an expert to give an opinion in the particular area on which they propose to testify. *Santoro*, ¶ 20; *Ayers*, ¶ 36; *Southern*, ¶ 49. The district court determines the first two questions of our Rule 702 inquiry while the determination of the third prong belongs to the jury following "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof[.]'" *Clifford*, ¶ 28 (quoting *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 2798 (1993)).

23

¶46    "Before a district court may allow an expert to express an opinion, an evidentiary foundation must be laid to demonstrate that the expert has adequate knowledge, by training or education, and sufficient factual information on which to base an opinion." *Wheaton v. Bradford*, 2013 MT 121, ¶ 16, 370 Mont. 93, 300 P.3d 1162 (citing *Cottrell v. Burlington N. R.R. Co.*, 261 Mont. 296, 301, 863 P.2d 381, 384-85 (1993); *Hulse v. State*, 1998 MT 108, ¶ 48, 289 Mont. 1, 961 P.2d 75). "We have stated that 'it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.'" *Wheaton*, ¶ 16 (quoting *Hulse*, ¶ 53).

¶47    In pursuit of her argument, Proctor relies on several cases in which the scientific foundation behind preliminary breath tests (PBT) was found to be unreliable to cast doubt on the NAT diagnosis and, by extension, Proctor's conviction. *State v. Strizich*, 286 Mont. 1, 12, 952 P.2d 1365, 1372 (1997); *State v. Weldele*, 2003 MT 117, ¶¶ 57-58, 315 Mont. 452, 69 P.3d 1162; *State v. Crawford*, 2003 MT 118, ¶ 13, 315 Mont. 480, 68 P.3d 848. In those cases, we held that "PBT results obtained under field conditions are not admissible at trial as evidence of [Blood Alcohol Content (BAC)] without a showing that the results are demonstrably accurate and reliable." *Crawford*, ¶ 11 (citing *Strizich*, 286 Mont. at 12, 952 P.2d at 1372; *Weldele*, ¶¶ 57-58). No scientific research had been advanced between *Strizich* and *Crawford* to counteract our skepticism of the use of PBTs as substantive evidence, which only estimate BAC. *Crawford*, ¶¶ 11, 13.

¶48    Here, the substantive evidence presented by the State through expert witnesses and P.P.'s treating physicians was based on the process of making a medical differential diagnosis. The evidence here demonstrates the medical conclusions resulted from a

24

differential diagnosis in which other causes of P.P.'s presenting symptoms were eliminated. The process of making a medical differential diagnosis is not novel scientific evidence. *State v. Price*, 2007 MT 269, ¶ 24, 339 Mont. 399, 171 P.3d 293. The testifying physicians, both as experts and as P.P.'s treating doctors, possessed the proper credentials to assess the injuries present in P.P. The court's evidentiary ruling noted that P.P.'s injuries consisted not only of the controversial SBS/AHT triad of retinal hemorrhages, brain swelling, and brain bleeding, but presented a variety of injuries, including injuries to where her spine meets the base of her skull, a broken femur, broken ribs, a broken toe, bruising, and abrasions. P.P.'s rib fractures could have been caused by gripping her infant body and shaking her. Proctor's assertion that shaking alone could not cause the triad without a level of force also causing significant neck injuries finds no purchase in the instant case because P.P., indeed, had a significant neck injury. P.P.'s neck injury and her additional injuries distinguish Proctor's case from the convictions secured based only on the SBS triad presented in *Nieves II*.

¶49 The State provided evidence of the reliability of making a medical diagnosis through the process of the differential diagnosis. Proctor's arguments to the contrary essentially attack the weight of that evidence. The District Court correctly determined the reliability of the relevant expert field and the qualifications of the expert witnesses under Rule 702, and the jury properly considered evidence of P.P.'s injuries, the timeline of when those injuries occurred, and who was present with P.P. when she was most likely afflicted. The District Court did not abuse its discretion in allowing expert testimony related to NAT.

¶50     *Issue Two: Whether the District Court erred by not suppressing evidence obtained under an impermissible general warrant.*

¶51     Montana provides for a robust right to privacy that "shall not be infringed without the showing of a compelling state interest." Mont. Const. art II, § 10. The United States Constitution and the Montana Constitution protect against unreasonable searches and seizures. U.S. Const. amend. IV; Mont. Const. art. II, § 11. A warrant to search must be based upon probable cause and specifically describe the place, person, and items to be seized. U.S. Const. amend. IV; Mont. Const. art. II, § 11; *State v. Mefford*, 2022 MT 185, ¶ 10, 410 Mont. 146, 517 P.3d 210. Article II, Section 11, of the Montana Constitution specifically provides for the people's security in their "electronic data and communications." *See also* Montana Constitutional Convention, Committee Report February 23, 1972, Vol. II, 632 (discussing a heightened right to privacy in anticipation of future technological advancements).

¶52     General warrants lacking in particularity are forbidden. *State v. Seader*, 1999 MT 290, ¶ 11, 297 Mont. 60, 990 P.2d 180 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971)). The "manifest purpose of this particularity requirement was to prevent general searches" and prevent the issuing of a warrant not "carefully tailored" to the probable cause justifying the search. *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S. Ct. 1013, 1016 (1987). Thus, under the particularity requirement, a warrant must "clearly state what is sought." *State v. Neiss*, 2019 MT 125, ¶ 57, 396 Mont. 1, 443 P.3d 435 (quotation omitted). The required level of specificity varies depending on the circumstances of the case and the nature of the evidence sought by the State. *Seader*, ¶ 13.

26

¶53 This Court has already recognized a reasonable expectation of privacy in cell phone data. *State v. LeDeau*, 2024 MT 305, ¶ 9, 419 Mont. 355, 560 P.3d 1195 (citing *Mefford*, ¶ 15). "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search" of a physical location due to the sheer quantity and quality of data these "minicomputers" often contain. *Riley v. California*, 573 U.S. 373, 393, 134 S. Ct. 2473, 2488-89 (2014). Contemporary cell phones "'have become storage devices for all manner of private information' and are a portal into a person's life which may contain hundreds of thousands of pictures and information about a person's 'health and activity, dating, video streaming, mobile shopping, banking, and password storage.'" *LeDeau*, ¶ 9 (quoting *Mefford*, ¶ 15). A cell phone search "would typically be far more exhaustive than a search of one's home as it contains a broad array of private information never found in a home in any form." *LeDeau*, ¶ 9 (citing *Mefford*, ¶ 15; *Riley*, 573 U.S. at 396-97, 134 S. Ct. at 2491).

¶54 Given the sheer volume of information available from a search of a cell phone, both in terms of the content stored locally on the device and digitally through connected applications, the specificity requirements under the right to privacy are critical. In *Mefford*, a probation officer suspected Mefford had violated his curfew based on data received from Mefford's GPS tracker. *Mefford*, ¶¶ 2-3. Mefford claimed that he needed to venture into the parking lot of his apartment building to connect his cell phone to the internet and communicate with his daughter. *Mefford*, ¶ 3. He consented to his probation officer accessing those relevant text messages, but the officer did not believe the recipient was in fact Mefford's daughter. *Mefford*, ¶ 4. In an effort to probe this suspicion, the officer

27

navigated to the phone's digital photo gallery to compare the recipient's profile picture with a photograph of Mefford's daughter and, in doing so, discovered suspected child sexual abuse materials. *Mefford*, ¶ 4. A later forensic search of the device confirmed the presence of those materials. *Mefford*, ¶ 5. In the subsequent prosecution for Sexual Abuse of Children, Mefford unsuccessfully moved to suppress the images, contending the officer's search unlawfully exceeded the extent of Mefford's consent. *Mefford*, ¶¶ 6-7. This Court reversed on the basis that, by exceeding the scope of Mefford's consent, the search was unreasonable and unlawful. *Mefford*, ¶ 45. Likewise, we have found sentencing conditions permitting the search of "*all* areas of *all* electronic devices[,]" in the absence of any evidence of the use of the device in connection with the underlying offense, as impermissibly overbroad. *LeDeau*, ¶ 9 (citing *Mefford*, ¶ 15; *Riley*, 573 U.S. at 396-97, 134 S. Ct. at 2491) (emphasis in original).

¶55 Proctor and the State both direct our attention to *Seader*, where a search warrant for a vehicle authorized the seizure of the "proceeds of drug sales[,]" including "anything else of value furnished or intended to be furnished in the exchange for the evidence or contraband relating to the use, sale, or manufacture of dangerous drugs." *Seader*, ¶ 7. Officers searching for Seader instead found his van and, after a positive "dog sniff," impounded the vehicle. *Seader*, ¶ 6. The search of the impounded vehicle, based upon a second warrant asserting probable cause related to the offense of drug possession, revealed an All-Terrain Vehicle (ATV) covered by a tarp. *Seader*, ¶ 8. Officers checked the ATV's vehicle identification number and discovered the ATV was stolen, leading to a felony theft charge against Seader. *Seader*, ¶ 8. This Court reversed the denial of Seader's motion to

suppress, reasoning that the second "search warrant for Seader's van was not sufficiently particular with respect to the items subject to seizure" because the "catchall" phrase "anything else of value" rendered the warrant facially overbroad. *Seader*, ¶¶ 8, 16. "We refuse[d] to compromise Fourth Amendment rights and those guaranteed by Article II, Section 11, of the Montana Constitution for the sake of efficient law enforcement[.]" *Seader*, ¶ 15. Particularity requires that "nothing is left to the discretion of the officer executing the warrant." *Seader*, ¶ 11 (citing *Stanford v. Texas*, 379 U.S. 476, 485, 85 S. Ct. 506, 511 (1965)). Instead, the *Seader* warrant provided officers with "unbridled discretion to engage in precisely what the particularity requirement seeks to prevent—a general, exploratory rummaging in Seader's belongings." *Seader*, ¶ 14.

¶56    The State asserts Proctor's reliance on *Seader* is misplaced as the "including, but not limited to" language and associated search categories in the present search warrant are not equivalent to the *Seader* catchall "anything else of value[.]" *Seader*, ¶ 15. We disagree. In the instant case, the warrant to search Proctor's cell phone is likewise overbroad and unparticularized as a matter of law. The warrant provided for law enforcement to search the entirety of Proctor's phone, with the only exclusions applying to communications with legal or religious counsel. With only these meager guardrails, the warrant otherwise allowed law enforcement to obtain "all data." This data included but was "not limited to" location history, internet history, all digital media, browsing history, and the communication history accessible on the cell phone. The search warrant did not provide sufficient guidance to the officers to "distinguish[] between items that could and could not be seized[.]" *Seader*, ¶ 14. Instead, the warrant granted unfettered discretion to the officers

29

to comb through Proctor's entire digital life. There must be particularization set forth in the warrant application of how the phone may lead to discoverable evidence of the offense for which there is probable cause. Otherwise, a warrant could issue for a phone belonging to anyone suspected of having committed a crime.

¶57 The *Mefford* and *Seader* standards, read together, delineate the specificity requirements for warrants. *Seader* broadly articulates the particularity requirement. *Seader*, ¶ 14. The Special Concurrence seeks to distinguish cell phone searches from the vehicle search in *Seader*. Special Concurrence, ¶ 97. However, this distinction is immaterial to an inquiry as to whether "catchall" language renders a warrant impermissibly overbroad: the issue turns on the specificity of the warrant as to what is to be searched—be it a house, a vehicle, or a cell phone. *Seader*, ¶ 13. Moreover, *Mefford* provides the principle that mere access to a phone does not provide law enforcement with carte blanche authority to search all aspects of the device. *Mefford*, ¶ 45. This comports with the caution needed to protect against rummaging through a cell phone and the virtually limitless information contained therein enunciated by the United States Supreme Court in *Riley*, 573 U.S. at 396-97, 134 S. Ct. at 2491, and likewise espoused by this Court in *Ledeau*, ¶¶ 9, 13.

¶58 The Special Concurrence draws our attention to several cases wherein purportedly broader warrants permissibly granted access to electronic devices which survived constitutional scrutiny. Special Concurrence, ¶¶ 98-102 (citing *United States v. Richards*, 659 F.3d 527 (6th Cir. 2011); *United States v. Burgess*, 576 F.3d 1078 (10th Cir. 2009); *United State v. Adjani*, 452 F.3d 1140 (9th Cir. 2006); *Nebraska v. McGovern*, 974 N.W.2d

30

595 (Neb. 2022)). The circumstances of these cases are factually distinguishable from the instant case because each of these cases involved crimes committed either with or on electronic devices using digital data. *See Seader*, ¶ 13 (citations omitted) ("The specificity required of a search warrant may vary depending on the circumstances of the case and the type of items involved. Generic categories or general descriptions of items are not necessarily invalid if a more precise description of the items to be seized is not possible.").

¶59 In *Richards*, the defendant was accused of being "a sophisticated pornography entrepreneur, operating at least a dozen websites that contained sexually explicit conduct involving adults and minors, pornographic images of boys under eighteen, and advertisements for links to other child pornography sites." *Richards*, 659 F.3d at 531. He additionally operated "other pornography-related websites and child pornography sites" which he managed using elaborate online marketing and advertising techniques. *Richards*, 659 F.3d at 531. "To manage the large amount of computer data, Richards kept several computers in his home . . . and utilized multiple servers in California that contained approximately one terabyte . . . of information" which he accessed and uploaded child pornography from an "internet protocol address tied to his home[.]" *Richards*, 659 F.3d at 531. Suffice to say, the crimes for which Richards was accused were closely linked to his use of the searched devices because these were crimes committed on the internet and the search warrant was specifically related to his operation of those illicit websites from his devices. *Richards*, 659 F.3d at 533-34.

¶60 *Burgess* concerned an investigation into drug use and possession in a mobile home following a traffic stop and positive canine alert. *Burgess*, 576 F.3d at 1082. During the

31

search, officers uncovered drugs and seized a laptop and two hard drives. *Burgess*, 576 F.3d at 1083. Law enforcement searched the hard drives for evidence "which would tend to show conspiracy to sell drugs," such as "trophy photos" of individuals "holding the controlled substance in front of a stack of money." *Burgess*, 576 F.3d at 1083-84. While previewing possible images for drug activity, officers discovered child sexual abuse material and paused the search to "secure[] a new warrant authorizing a search for evidence of child sexual exploitation." *Burgess*, 576 F.3d at 1084. In affirming the denial of Burgess's motion to suppress the search of his computer and hard drives, the Tenth Circuit reasoned the devices could be seized under the automobile exception to the Fourth Amendment and, dispositive for our purposes here, the subsequent initial search warrant was of a sufficiently narrow scope limited to those digital records of "drug related evidence[,]" specifically the "trophy photos" referenced in the officer's supporting affidavit. *Burgess*, 576 F.3d at 1092. The particularity of the warrant was further supported by "the executing officer's . . . understanding of and respect for the narrow scope authorized by the warrant" as demonstrated by his immediate cessation of the search pending a new warrant once the child exploitation material was discovered. *Burgess*, 576 F.3d at 1091-92. The meticulous attention to the proper search procedures and safeguards in *Burgess* distinguishes the device search there from the instant case.

¶61 The devices searched in *Adjani* were related to an internet extortion scheme wherein the defendant conspired over email—using the same email address listed on the extortion letter sent to the victim. *Adjani*, 452 F.3d at 1143. Adjani had threatened to expose private corporate data, including customer payment details, unless his intended victim paid a

32

ransom. To demonstrate his ability to deliver on his threats, Adjani provided previews of his ill-gotten classified data. *Adjani*, 452 F.3d at 1143. In reversing the trial court's suppression of the fruits of the search of Adjani's and a coconspirator's computers, the Ninth Circuit reasoned "[t]he government needed only to satisfy the magistrate judge that there was probable cause to believe that evidence of the crime in question—here extortion—could be found on computers accessible to Adjani in his home, including—as it developed—[the coconspirator's] computer." *Adjani*, 452 F.3d at 1147. The warrant properly detailed "the extortion scheme *and the instrumentalities of the crime*[.]" *Adjani*, 452 F.3d at 1147 (emphasis added).

¶62  *McGovern* similarly involved the valid search of a cell phone suspected of being used in the crime charged because the defendant, accused of voyeuristically viewing a woman showering in her apartment, was also suspected of using his phone to "capture[] photographs and[/]or videos of [the victim] in a state of undress." *McGovern*, 974 N.W.2d at 604. The phone, dropped by the defendant as he fled when confronted by the victim's partner, could also contain evidence of the suspect's identity. *McGovern*, 974 N.W.2d at 605. The warrant authorized a search for evidence of McGovern's unlawful intrusion, a crime defined as "intruding upon another in a place of solitude or seclusion[,]" encompassing "photographing or filming the intimate area of another without his or her knowledge or consent." *McGovern*, 974 N.W.2d at 617. Thus, the instrumentality of this particular crime could have included a cell phone, such as the one recovered from McGovern's flight.

¶63 On the other hand, language authorizing the search of "any and all files" on a defendant's cell phone failed the particularity requirement. *United States v. Winn*, 79 F. Supp. 3d 904, 917 (S.D. Ill. 2015); Special Concurrence, ¶ 103. There, police lacked probable cause that "everything on the phone was evidence of the crime of public indecency." *Winn*, 79 F. Supp. 3d at 919. Winn was accused of photographing children at a local pool while rubbing his genitals through his swim trunks. *Winn*, 79 F. Supp. 3d at 909. Officers promptly began the investigation by interviewing Winn and obtaining his cell phone the day after the incident on June 21, 2014. *Winn*, 79 F. Supp. 3d at 910. However, the supervising detective did not immediately apply for a warrant to search the phone and, after days off, scheduled trainings, and other investigatory obligations, a warrant, premised on an allegation of public indecency and containing "unabridged template" language, was not obtained until June 30. *Winn*, 79 F. Supp. 3d at 910-11, 922.[7] The subsequent search revealed child sexual abuse material and Illinois charged Winn with one count of public indecency and nearly two dozen counts related to child pornography. *Winn*, 79 F. Supp. 3d at 911-12. "Based on the complaint supporting the search warrant, there was probable cause to believe that only two categories of data could possibly be evidence of the crime: photos and videos[,]" and neither facts learned during the

---

[7] In *Winn*, "the complaint for the search warrant presented probable cause to search the phone for evidence of public indecency, but the warrant authorized a search of evidence of an entirely different crime: disorderly conduct." *Winn*, 79 F. Supp. 3d at 916. The court ultimately determined this mistake did not render the warrant facially defective because (1) Winn conceded that probable cause existed to issue the warrant for public indecency and (2) the "facts alleged in the complaint were sufficient to establish probable cause to believe that Winn's cell phone contained evidence of disorderly conduct" because Winn's conduct also met the definition of that offense under a "breach of peace" theory. *Winn*, 79 F. Supp. 3d at 917.

investigation nor the investigating detectives' training and experience supported a reasonable belief that "the calendar, phonebook, contacts, [text and media messages,] emails, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, or system files were connected with Winn's act of public indecency." *Winn*, 79 F. Supp. 3d at 919-20. Thus, the court concluded, the warrant "authorized the police to seize the entirety of the phone and rummage through every conceivable bit of data, regardless of whether it bore any relevance whatsoever to the criminal activity at issue." *Winn*, 79 F. Supp. 3d at 922.

¶64 Finally, the Special Concurrence relies upon *Richardson v. Maryland*, 282 A.3d 98 (Md. Ct. of App. 2022), a case very much on point to the facts here. Special Concurrence, ¶ 104. Richardson, who conditionally pled guilty to conspiracy to commit robbery and possession of a handgun, appealed the denial of his motion to suppress the warranted search of a cell phone he abandoned at the scene of an altercation. *Richardson*, 282 A.3d at 105. Although the denial was ultimately affirmed on the basis investigating officers had acted in good faith, the court concluded the warrant failed the particularity requirement because the warrant authorized the search of the entire phone without temporal restrictions. *Richardson*, 282 A.3d at 123-24. Richardson was alleged to have obtained the at-issue phone in a separate robbery. *Richardson*, 282 A.3d at 106. Rather than focus on the particular data or applications related to the robbery of the phone, the warrant impermissibly provided unfettered access to all aspects of the device. *Richardson*, 282 A.3d at 123. "While reasonable minds may differ at times on whether a warrant is sufficiently particular, one thing is clear: given the privacy interests at stake, it is not

35

reasonable for an issuing judge to approve a warrant that simply authorizes police officers to search everything on a cell phone." *Richardson*, 282 A.3d at 124.

¶65 In sum, *Richards*, *Adjani*, and *McGovern* all concerned crimes which occurred on cell phones or computers and search warrants tailored to that effect. *Burgess* saw investigators seek a supplementary warrant once the initial search revealed evidence of additional crimes. The defective warrants in *Winn* and *Richardson* prove pertinent to the instant case in that the warrants granted unfettered access to devices with attenuated connections to the crimes charged.

¶66 "Crime has changed, as have the means of law enforcement[.]" *Steagald v. United States*, 451 U.S. 204, 217 n.10, 101 S. Ct. 1642, 1650 n.10 (1981) (citing *Katz v. United States*, 389 U.S. 347, 352-53, 88 S. Ct. 507, 511-12 (1967)). Nevertheless, our constitutional protection from unreasonable searches and seizures abides:

> While the common law thus sheds relatively little light on the narrow question before us, the history of the Fourth Amendment strongly suggests that its Framers would not have sanctioned the instant search. The Fourth Amendment was intended partly to protect against the abuses of general warrants that had occurred in England and of the writs of assistance used in the Colonies. *See Payton v. New York*, 445 U.S. [573,] 608-09, 100 S. Ct. [1371,] 1391-92 (1980) (White, J., dissenting); *Boyd v. United States*, 116 U.S. 616, 624-29, 6 S. Ct. 524, 529-32 (1886); [Nelson B.] Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 13-78 (1937). The general warrant specified only an offense— typically seditious libel—and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched. Similarly, the writs of assistance used in the Colonies noted only the object of the search—any uncustomed goods—and thus left customs officials completely free to search any place where they believed such goods might be. The central objectionable feature of both warrants was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home. *Stanford v. Texas*, 379 U.S. 476, 481-85, 85 S. Ct. 506, 509-12 (1965). An

> arrest warrant, to the extent that it is invoked as authority to enter the homes of third parties, suffers from the same infirmity. Like a writ of assistance, it specifies only the object of the search [. . .] and leaves to the unfettered discretion of the police the decision as to which particular homes should be searched. We do not believe the Framers of the Fourth Amendment would have condoned such a result.

*Steagald*, 451 U.S. at 220, 101 S. Ct. at 1651-52. Here, the warrant specified the device to be searched but suffered the infirmity of leaving unfettered discretion to the officers to rummage through the entirety of a device containing the entirety of Proctor's digital life. That the fruits harvested from this search—banal Pinterest activity, attempts at communicating reassurances to Tim during some of the most heightened moments of P.P.'s ordeal—had such little bearing on the actual trial and the State's theory of guilt underscores the necessity of our constitutional protections against such unreasonable rummaging. The Framers, in 1789 and 1972, would not have condoned such an undisciplined intrusion into Proctor's private life and, accordingly, neither do we.

¶67 However, our analysis does not stop at this analytical juncture because the admission of evidence obtained through the overbroad search warrant was ultimately harmless error not meriting reversal. "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows the error was prejudicial." Section 46-20-701(1), MCA. Under our harmless error analysis, we first look to "whether the error was a structural error or a trial error." *State v. Lake*, 2019 MT 172, ¶ 40, 396 Mont. 390, 445 P.3d 1211 (citing *State v. Van Kirk*, 2001 MT 184, ¶¶ 37, 41, 306 Mont. 215, 32 P.3d 735). Structural error "affects the framework within which the trial proceeds, rather than simply an error in the trial process itself, and is automatically

reversible." *Lake*, ¶ 40 (citing *Van Kirk*, ¶¶ 38-39). Conversely, trial error is "the type of error that typically occurs during the presentation of the case to the jury." *Lake*, ¶ 40 (citing *Van Kirk*, ¶ 40; § 46-20-701(1), MCA). Once we establish the error is not structural, we examine whether the State has "demonstrate[d] that the error at issue was not prejudicial to the defendant." *Lake*, ¶ 40 (citing *Van Kirk*, ¶ 42). To satisfy this second step of our harmless error analysis, the State must "'demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the [defendant's] conviction.'" *Lake*, ¶ 40 (quoting *Van Kirk*, ¶ 47). Here, the admission of evidence obtained through the overbroad search warrant constituted trial, not structural, error. *Lake*, ¶ 40; *Van Kirk*, ¶ 40. The burden thus shifts to the State to prove Proctor was not prejudiced by the admission of the tainted evidence.

¶68     The cell phone content admitted at trial consisted of photographs of P.P., including more than twenty photographs documenting her injuries; Proctor's web history; and text messages, including communication with Tim during the beginning of P.P.'s treatment at the Kalispell hospital. The State asserts this tainted evidence was cumulative or had a minimal impact during the trial. Proctor argues the use of the cell phone data contributed to the jury's verdict finding her guilty.

¶69     The photographs admitted at trial showed various bruises and abrasions on P.P. Thus, the photographs were cumulative to the testimony of multiple witnesses who testified to seeing these injuries. The State further characterizes these pictures, which depicted only P.P.'s bruises and abrasions, as showing *bodily injury*, not the *serious* bodily injury Proctor was convicted of inflicting on P.P. The latter category of injuries—the bone fractures and

brain injuries—were not proven at trial through the photographs obtained from Proctor's cell phone. We agree this error did not contribute to Proctor's conviction.

¶70 As for Proctor's web history, this, too, constituted cumulative evidence. The State notes, based on Tim's testimony, that Proctor's attorney instructed Tim to take screenshots of the Owlet data while P.P. was in the hospital in October 2021 and Proctor's medical expert witness testified to being hired by her defense counsel at approximately the same time. Thus, the tainted evidence served to supplement evidence of when Proctor sought legal counsel which was admitted independently of the data obtained from her cell phone. Finally, the two text messages and the Pinterest activity admitted were likewise cumulative: the State used these to buttress properly admitted evidence of Proctor's behavior while P.P. was in crisis, properly ascertained through the witnesses who interacted with her at the time. The State's claim that these errors were harmless finds support in our review of the record, from which we conclude the tainted evidence admitted from the cell phone did not contribute to Proctor's conviction.

¶71 Contrary to the Concurrence and Dissent, ¶ 110, our analysis here comports with *Van Kirk*. The tainted evidence was limited in application and provided scarce additional context to the events leading to P.P.'s arrival and stay at the hospitals in Helena and Kalispell. We have catalogued the tainted evidence obtained from an unlawful warrant offered by the State and found cumulative analogues in other properly admitted evidence. The bulk of the evidence admitted at trial detailing the State's theory of Proctor's guilt centered specifically on the 15-minute window in which Tim left P.P., then crying, on blankets on the floor while he spoke with his boss in the driveway, before returning inside

to find P.P. in her car seat, now docile and injured. The State's expert witnesses offered a timeline for these injuries explaining the delayed onset time for P.P.'s most severe symptoms following an acute incident of physical trauma. This evidence was ultimately untainted by unlawful warrants or other irregularities calling into question the fairness of Proctor's trial writ large.

¶72 The warrant to search Proctor's cell phone was an unlawfully overbroad and unparticularized general warrant because the warrant failed to provide sufficient guidance to investigating officers and instead granted unfettered discretion to rummage through the voluminous data contained within her cell phone. However, the limited evidence from the cell phone admitted at trial was ultimately harmless error.

¶73 *Issue Three: Whether the prosecutor violated Proctor's right to a fair trial with impermissible statements related to Proctor's character.*

¶74 Proctor points to the repeated references during the State's closing argument to her search for legal counsel and phone history, through testimony elicited from Van Dyke, and from statements made by the prosecutor, as undermining her right to a fair trial. Proctor made no objections to the State's comments made during closing argument. Thus, Proctor asserts errors implicating her fundamental right to a fair trial should be reviewed under this Court's plain error standard.

¶75 We apply the plain error doctrine sparingly, on a case by case basis. *Devereaux*, ¶ 41. We may invoke plain error review in situations where (1) the defendant asserts an error implicating a fundamental right and (2) failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness

40

of the trial or proceedings, or compromise the integrity of the judicial process. *Devereaux*, ¶ 21 (citing *State v. Favel*, 2015 MT 336, ¶ 13, 381 Mont. 472, 362 P.3d 1126; *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79).

¶76 Criminal defendants are guaranteed the right to a fair trial by a jury. *Haithcox*, ¶ 24 (citing U.S. Const. amend. VI; Mont. Const. Art. II, § 24; *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091). Prosecutorial misconduct may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial. *Haithcox*, ¶ 24 (citation omitted). This Court will not "presume prejudice from the alleged prosecutorial misconduct" and the defendant bears the burden of proving the challenged conduct violated their substantial rights, beyond undesirability and even universal condemnation. *Haithcox*, ¶ 24 (citing *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)). Thus, our analysis of such a claim turns on whether a prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Haithcox*, ¶ 24 (citing *Darden*, 477 U.S. at 181, 106 S. Ct. at 2471).

¶77 Turning first to Van Dyke's testimony, we have already held the inadmissible evidence resulting from the overbroad search warrant on Proctor's cell phone was harmless error. Van Dyke briefly testified to the limited information obtained from Proctor's phone, namely that she had used the Pinterest application and searched for defense counsel during an incredibly acute phase of P.P.'s ordeal. Our review of the trial transcript shows that Van Dyke provided a brief catalogue of the data seized from Proctor's phone, including her searches for defense attorneys, but did not elaborate on what "stood out" with this

41

information nor did he provide any hypothesis for Proctor's reason for the inquiry. The admission of this evidence did not prejudice Proctor. Thus, because the elicited testimony did not concretely create an inference that this phone activity indicated her guilt in the crime charged, we cannot say that this undermined the fairness of the proceedings. We, thus, decline to reverse under plain error.

¶78 Turning next to the prosecutor's comments, Proctor argues these amounted to prosecutorial misconduct. We use a two-step analysis to determine whether improper comments have prejudiced a defendant's right to a fair trial. *State v. Lindberg*, 2008 MT 389, ¶ 25, 347 Mont. 76, 196 P.3d 1252 (citations omitted). First, we determine whether the prosecutor made improper comments. *Lindberg*, ¶ 25. Second, we determine whether those comments prejudiced a defendant's right to a fair trial. *Lindberg*, ¶ 25 (citations omitted).

¶79 We begin by examining whether the prosecutor's comments were improper. Prosecutors, except as otherwise prohibited by applicable constitutional rights, statutory rules of procedure, and rules of evidence, have wide latitude to present and elicit relevant incriminating evidence and to challenge any evidence presented by the defense. *Miller*, ¶ 22. The restrictions on prosecutorial latitude extend *inter alia* to commenting on facts not in evidence, attesting to personal knowledge of facts, and improperly expressing personal opinion regarding the guilt of the accused. *Miller*, ¶¶ 23, 24, 28 (citations omitted). "[P]rosecutorial closing arguments and comments are generally proper if made in the context of discussing the evidence, how it relates or corresponds to the law as stated in the jury instructions [. . .], and reasonable inferences from the evidence." *Miller*, ¶ 26.

¶80     Here, the prosecutor made statements during closing argument juxtaposing her own character to that of Proctor's.  In doing so, the prosecutor highlighted her preparation for trial as evidence of her character under pressure whereas Proctor, at the critical moments of P.P.'s transfer between Helena and Kalispell, instead sent unrealistically optimistic text messages to Tim and searched for a defense attorney rather than make an attempt to understand P.P.'s medical situation.  With these comments, the prosecutor precariously treaded on "thin ice" by referring to the diligence of the prosecution, which are facts not in evidence, and providing personal commentary of Proctor's character.  *Miller*, ¶ 38.  These comments were no doubt improper, satisfying the first step of our analysis.

¶81     Nonetheless, the burden remains on Proctor to demonstrate we should exercise plain error review to consider whether the prosecutor's comments resulted in an unfair trial under the totality of the circumstances.  The defendant bears the burden to demonstrate that a prosecutor's comments, viewed in the context of the case in its entirety, prejudiced their right to a fair and impartial trial.  *Lindberg*, ¶ 25 (citing *State v. Wing*, 2008 MT 218, ¶ 33, 344 Mont. 243, 188 P.3d 999; *State v. Gladue*, 1999 MT 1, ¶ 12, 293 Mont. 1, 972 P.3d 827).

¶82     Proctor draws our attention to several cases in which the prosecutorial misconduct was similar to the conduct at issue here.  Her argument necessarily must turn on whether there was a reasonable possibility the prosecutor's misconduct contributed to her conviction.  *United States ex rel. Macon v. Yeager*, 476 F.2d 613, 616-17 (3d Cir. 1973).  In *Macon*, the prosecutor noted the defendant's decision to call a lawyer following a violent incident.  *Macon*, 476 F.2d at 614.  The Third Circuit reversed after concluding that the

43

record did not indicate "a situation where the case against the petitioner was otherwise so overwhelming that the constitutional error did not, beyond a reasonable doubt, contribute to the conviction." *Macon*, 476 F.3d at 616. In *Connecticut v. Angel T.*, 973 A.2d 1207 (Conn. 2009), the Connecticut Supreme Court likewise found the state's evidence, exemplified by multiple reports of jury deadlock and credibility issues with a key witness, did not overcome the constitutional error of prosecutorial misconduct. *Angel T.*, 973 A.2d at 1227-28. In *Washington v. Espey*, 336 P.3d 1178 (Wash. Ct. App. 2014), the prosecutor "argued that because [the defendant] exercised his constitutional right to counsel, he was lying[,]" thereby improperly and incurably commenting on and penalizing the defendant's exercise to his constitutional right to counsel. *Espey*, 336 P.3d at 1182. Because Washington's prosecution hinged on a theory that Espey lacked credibility, the prosecutor's statements improperly created the inference his utilization of a lawyer meant he was dishonest, thus warranting reversal of his conviction. *Espey*, 336 P.3d at 1183. Finally, *Pennsylvania v. Lang*, 275 A.3d 1072 (Pa. Super. Ct. 2022), also found a defendant's constitutional right to a fair trial was prejudiced by the introduction of evidence of internet searches for criminal defense attorneys. *Lang*, A.3d at 1085. The court there had determined that the internet search evidence "would not provide insight as to [the defendant's] state of mind following an accusation of criminal behavior" because the searches were conducted long before he had been subjected to an active investigation and the probative value of the internet searches was substantially outweighed by the prejudicial effect of their admission. *Lang*, A.3d at 1085-86.

¶83 Proctor argues that the instant case offers no obvious guilt, overwhelming evidence, or eyewitness support, and thus the prosecutorial misconduct served only to prejudicially obfuscate the evidentiary disputes over who or what caused P.P.'s injuries and thus misled the jury into inferring Proctor's guilt from constitutionally protected actions. We disagree. As a preliminary matter, we have already held that the District Court did not abuse its discretion in admitting expert testimony related to the cause of P.P.'s injuries. We can distinguish *Macon* and *Angel T.*, which involved more attenuated evidence, from the instant case because the substantial evidence admitted here demonstrated that P.P. had been abused, the abuse resulted in severe injuries, that P.P. had several fractures at different stages of healing suggesting older instances of abuse, and that P.P. last appeared healthy immediately before Proctor had exclusive access to her. Unlike *Espey*, Proctor's credibility was not at issue in the case; the impermissible use of her internet searches, which we have already deemed harmless error, did not assert that Proctor, who did not testify, was dishonest. Rather the State's prosecution turned on the medical evidence introduced at trial. Likewise, contrary to *Lang* and regardless of the breadth of the search warrant, the internet searches occurred during the acute phase of initial suspicions P.P. had been abused; when the suspicions were conveyed to Proctor; and immediately before the State pursued criminal charges.

¶84 We are unconvinced by Proctor's argument that the improper instances of prosecutorial misconduct prejudiced her right to a fair trial. While the prosecutorial misconduct is disturbing and, under different facts might be grounds for reversal, we must consider them against the overwhelming evidence that P.P. was abused by Proctor. In the

context of the trial in its entirety, the prosecutor's closing argument inelegantly attempted to place Proctor's behavior in late September and early October in context of the significant evidence of P.P.'s injuries, to which admissible evidence indicated a prolonged period of NAT resulting in severe new and healing bone fractures, brain injury, bruising, abrasions, retinal hemorrhages, and neck injury. Proctor does not challenge the sufficiency of this evidence on appeal and our review of the record does not provide for the conclusion the prosecutorial misconduct sought to bolster a factually weak case presented by the State. The primary focus of the State was upon the medical evidence, its expert medical witnesses, and the window of time immediately preceding the onset of P.P.'s acute trauma; thus, the prosecutor's statements at closing argument, though reprehensible, were not germane to the State's ultimate theory of Proctor's guilt. Instead, the State relied upon extensive expert medical evidence to recreate a timeline in which P.P.'s injuries developed following an acute instance of physical abuse. The evidence presented to the jury demonstrated that this instance occurred when Proctor had exclusive access to and control of P.P. in the critical moments—marked by Proctor's overwhelming exhaustion and frustration at new parenthood, moving, and living apart from a distracted spouse—leading up to P.P.'s hospitalization. This evidence, in the context of the trial as a whole, outweighs the prosecutor's overzealous allusion to an inherent wickedness of Proctor's character in closing argument.

¶85 Proctor has failed to meet her burden for this Court to exercise plain error review. The misconduct at issue here did not result in a manifest miscarriage of justice, leave

46

unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. Accordingly, we decline to exercise plain error review.

¶86 *Issue Four: Whether Proctor's counsel was ineffective.*

¶87 Criminal defendants are guaranteed effective assistance of counsel. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861 (citing U.S. Const. amend. VI; U.S. Const. amend. XIV; Mont. Const. art. II, § 24). To succeed on an ineffective assistance of counsel claim, the defendant must prove two elements. *Whitlow*, ¶ 10 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). First, the defendant must prove that counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Second, the defendant must prove that this deficient performance prejudiced their right to a fair trial. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. If the defendant fails to satisfy one of the *Strickland* prongs, there is no need to address the other prong. *Whitlow*, ¶ 11.

¶88 Proctor argues her counsel was ineffective for failing to object to the admission of Proctor's internet searches for defense counsel and to the prosecutor's statements during closing arguments. Having determined these instances of alleged deficiencies would not have contributed to her conviction given the overwhelming evidence of P.P.'s non-accidental injuries, we likewise decline to conclude any possible deficient performance on the part of Proctor's trial counsel prejudiced her right to a fair trial.

## CONCLUSION

¶89 The District Court did not abuse its discretion by allowing expert testimony on NAT. The warrant to search Proctor's phone was an impermissible general warrant, but

the admission of any evidence seized was ultimately harmless.  The prosecutor made impermissible comments on Proctor's character and internet search history in closing arguments, but this did not constitute plain error meriting reversal.  Finally, Proctor was not denied effective assistance of counsel.

¶90    Affirmed.


/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER


Justice Jim Rice, specially concurring.

¶91    I concur with the Court's decision to affirm Issue 2, the warrant issue, but I would conclude the warrant to search Proctor's cellphone was valid, and thus disagree the warrant was "unlawfully overbroad" and amounted to an "unparticularized general warrant," necessitating harmless error review.  Opinion, ¶ 72.  I concur with the remainder of the Court's Opinion.

¶92    Search warrant specificity "serves to prevent a 'general, exploratory rummaging in a person's belongings.'"  *Seader*, ¶ 11 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971)); *see also Maryland v. Garrison*, 480 U.S. 79, 84, 107 S. Ct. 1013, 1016 (1987) (The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." (internal footnote omitted)).  A search warrant must provide enough specificity such that "nothing is left to

48

the discretion of the officer executing the warrant." *Seader*, ¶ 11 (citing *Stanford v. Texas*, 379 U.S. 476, 485, 85 S. Ct. 506, 511 (1965)). Yet this discretion-limiting rule "cannot be read literally because few warrants would survive such a stringent rule." *Seader*, ¶ 12. "The specificity required of a search warrant may vary depending on the circumstances of the case and the type of items involved." *Seader*, ¶ 13.

¶93 The Court reasons the search warrant of Proctor's phone "provided for law enforcement to search the entirety of Proctor's phone, with the only exclusions applying to communications with legal or religious counsel." Opinion, ¶ 56. The Court states the exclusions of communications with legal or religious counsel were the only guardrails to the warrant, which it calls "meager." Opinion, ¶ 56. The Court concludes that the warrant for Proctor's phone was unlawful because it "did not provide sufficient guidance to the officers to 'distinguish[] between items that could and could not be seized[.]'" Opinion, ¶ 56 (citing *Seader*, ¶ 14).

¶94 The warrant application provided information learned by police in their investigation that P.P.'s parents used their phones to contact medical personnel and to utilize a medical device to monitor P.P.'s vital signs, that the parties had reported their locations to medical personnel, including Proctor's locations in town and Tim Proctor's work-related travel, which the District Court noted provided "a common-sense conclusion that GPS evidence in the phones" would verify the parties' locations in the days prior to P.P.'s presentation in the emergency room, and that the parties had conducted significant communications on their phones regarding news that P.P. had suffered physical abuse. The warrant itself provided that any data seized must be "related to the crimes or offenses

identified herein," meaning Aggravated Assault. Accordingly, any data unrelated to the charged offense of Aggravated Assault of P.P. was excluded by the warrant's plain terms. As the District Court reasoned:

> This language provided a temporal limitation to the evidence seized because P.P. was born on May 28, 2021, and the warrant was obtained on October 28, 2021, five months later. It also provided a substantive limitation of the evidence to be seized as related to the Aggravated Assault identified in the application and warrant.

¶95 Thus, an accurate description of the warrant's prohibitions includes: (1) all data unrelated to the charged crime, (2) information outside the inherent "temporal limitation" framed by the investigative conclusions set forth in the application, (3) privileged communications with counsel or clergy, and (4) other exclusions agreed to by the parties. Although not dispositive, the warrant's limitation to data related to the specific crime charged narrowed its scope considerably, and prevented "exploratory rummaging" prohibited by the Fourth Amendment and Article II, Section 11, of the Montana Constitution. *Seader*, ¶ 11.

¶96 The question is thus whether a search warrant authorizing a search for "all data . . . related to the crimes or offenses identified herein" under the limitations created therein satisfies the constitutional specificity requirement when viewed in light of the specific facts of this case, the supporting affidavit, and the nature of the charged offense. While "all data" may constitute a generic description by itself, "[g]eneric categories or general descriptions of items are not necessarily invalid if a more precise description of the items to be seized is not possible." *Seader*, ¶ 13 (citing *United States v. Spilotro*, 800 F.2d

50

959, 963 (9th Cir. 1986)). The relevant inquiry asks whether the warrant makes clear what items may or may not be seized. *Seader*, ¶ 12.

¶97    I would note that the primary case cited by both parties, *Seader*, is a case decided nearly three decades ago in 1999 when cell phones were far from ubiquitous and digital storage was very limited, given that floppy disks and VHS tapes were still in use. Twenty-seven years is a very long time in digital technology. *Mefford*, a 2022 case, is primarily a consent search case and did not directly address particularity of a search warrant for cell phone data. *See Mefford*, ¶¶ 17–29. While *Seader* remains good law, it does not grapple with the unique difficulties of crafting and executing search warrants for seizure of modern digital evidence, including the sheer volume and intermingled nature of data stored on contemporary smartphones, nor did it consider a world in which cell phones are utilized by virtually everyone, including for storage of their communications, and commonly serve as tools in the commission of crimes or the concealment of evidence that follows.

¶98    Digital data available on computer readable media, such as computers, phones, and the like, complicates the specificity inquiry and requires careful balance:

> On one hand, it is clear that because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of the hard drive may be required. . . . On the other hand, . . . granting the Government a *carte blanche* to search every file on the hard drive impermissibly transforms a limited search into a general one.

*United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) (quoting *United States v. Stabile*, 633 F.3d 219, 237 (3d Cir. 2011)). In the same vein, the Tenth Circuit notes that:

> [I]t is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives.
>
> .    .    .
>
> [I]n the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the search is of computer files or physical files.  It is particularly true with image files.

*United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009) (internal footnote omitted).

The warrant at issue in *Richards* specified "all content of the . . . servers at BlackSun 1200 West 7th Street, Los Angeles, California 90017, . . ."  *Richards*, 659 F.3d at 535.  The warrant at issue in *Burgess* specified "certain property and evidence to show the transportation and delivery of controlled substances, which may include . . . computer records[.]" *Burgess*, 576 F.3d at 1083.  Neither warrant failed the specificity requirement. *See Richards*, 659 F.3d at 541–42 ("The scope of the warrant was restricted to a search for evidence of child pornography crimes and did not permit a free-ranging search."); *Burgess*, 576 F.3d at 1092 ("Our reading of the scope of the 'computer records' subject to search, narrowing it to looking for drug related evidence, comes from the text of the warrant, with due regard to context, coupled with the specifics of the supporting affidavit . . . .").  In short, although the warrants at issue in both cases contained broad "all content" language or general categories such as "computer records," the particularity analysis turned on the facts and circumstances of the crime charged, the supporting affidavit, and the nature of the digital evidence sought.

¶99    In *United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006), the Ninth Circuit upheld a warrant that sought "evidence of violations of [18 U.S.C. § 875(d)]: Transmitting Threatening Communications With Intent to Commit Extortion," including "[c]omputer, hard drives, computer disks, CD's, and other computer storage devices." *Adjani*, 452 F.3d at 1144. The warrant directed that, "[i]n searching the data, the computer personnel will examine *all of the data* contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein." *Adjani*, 452 F.3d at 1144 (emphasis added). In determining whether the warrant was sufficiently particular, the court applied a three-prong test:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Adjani*, 452 F.3d at 1147 (quoting *Spilotro*, 800 F.2d at 963). Although the warrant included broad "all data" language, the court found that it satisfied all three prongs. *Adjani*, 452 F.3d at 1148–49.

¶100   Under that test, the first prong was clearly satisfied. *Adjani*, 452 F.3d at 1148. With respect to the second prong, whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, the court emphasized that the warrant affidavit "*began by limiting the search for evidence of a specific crime* [charged]," and that "the extensive statement of probable cause in the affidavit [had] detailed the alleged crime and Adjani's unlawful scheme." *Adjani*, 452 F.3d

53

at 1148–49 (emphasis added). The court concluded on the second prong: "the warrant objectively described the items to be searched and seized with adequate specificity and sufficiently restricted the discretion of agents executing the search." *Adjani*, 452 F.3d at 1148.

¶101  With respect to the third prong, the Ninth Circuit acknowledged the "heightened specificity concerns in the computer context," but nevertheless concluded "the government described the items to be searched and seized as particularly as could be reasonably expected given the nature of the crime and the evidence it then possessed." *Adjani*, 452 F.3d at 1149. In other words, the court considered the facts and circumstances of the case (such as the evidence the government possessed at the time), the nature of the crimes charged, the nature of the evidence sought, and the contents of the affidavit supporting the search warrant. The warrant's language was found to be "not unreasonable under the circumstances," particularly because "computer files are easy to disguise or rename" and the "government should not be required to trust the suspect's self-labeling when executing a warrant." *Adjani*, 452 F.3d at 1149–50.

¶102  State courts have also applied a case-by-case approach to search warrants seeking digital data. In *State v. McGovern*, 974 N.W.2d 595 (Neb. 2022), the Nebraska Supreme Court upheld a warrant to search the defendant's cell phone in a voyeurism case. *McGovern*, 974 N.W.2d at 614. The warrant authorized a broad search of the phone's data, including "data that may identify the owner" of the phone such as call histories, photographs and metadata, messages, videos, GPS data, internet browser files, and "any deleted and/or unallocated content . . . ." *McGovern*, 974 N.W.2d at 605. The court

54

rejected the defendant's particularity challenge, noting the inherent challenges of describing precisely where data may be found: "officers cannot predict where evidence of a crime will be located in a cell phone or in what format, such as texts, videos, photographs, emails, or applications." *McGovern*, 974 N.W.2d at 614. The court concluded:

> The most important constraint in preventing unconstitutional exploratory rummaging is that the warrant limit the search to evidence of a specific crime, ordinarily within a specific time period, rather than allowing a fishing expedition for all criminal activity. Here, the warrant named a specific crime, the incorporated affidavit identified a time period, and both documents listed specific areas of the phone to be searched.
>
> The nature of the crime—unlawful intrusion—limited the scope of the search; law enforcement officers knew they were to search for evidence regarding the device's owner or user along with such things as photographs and videos. The warrant also listed specific areas to be searched within the cell phone, which were consistent with those described in the affidavit.

*McGovern*, 974 N.W.2d at 614.

¶103 To be sure, there are cases in which broad, all-encompassing "all data" type language fails the particularity requirement. In *United States v. Winn*, 79 F.Supp.3d 904 (S.D. Ill. 2015), the warrant authorized the seizure of "any and all files" on the defendant's phone for evidence of public indecency. *Winn*, 79 F.Supp.3d at 919. The court noted that the "major, overriding problem with the description of the object of the search—'any or all files'—is that the police did not have probable cause to believe that everything on the phone was evidence of the crime of public indecency." *Winn*, 79 F.Supp.3d at 919. In *Adjani*, the warrant specifically identified the crime charged and the Ninth Circuit found that reference helpful to establishing particularity, *Adjani*, 452 F.3d at 1148–49, whereas in *Winn* the mere reference to the charged statute was not viewed as sufficient to limit the

55

scope of the warrant. *Winn*, 79 F.Supp.3d at 921 ("[A] reference to a general statute certainly will not satisfy the Fourth Amendment's particularity requirement when the police could have more precisely described the evidence that they were seeking or included other limiting features."). The court in *Winn* concluded the warrant was not limited in time and did not limit the search with "as much particularity as the circumstances allowed," and instead "authorized the police to seize the entirety of the phone and rummage through every conceivable bit of data, regardless of whether it bore any relevance whatsoever" to the charge. *Winn*, 79 F.Supp.3d at 918–22. The court stated: "the warrant told the police to take everything, and they did." *Winn*, 79 F.Supp.3d at 922.

¶104   Similarly, in *Richardson v. State*, 282 A.3d 98 (Md. 2022), the warrant authorized a search of "[a]ll information . . . and any other data stored or maintained inside of" the defendant's phone. *Richardson*, 282 A.3d at 108. The Maryland Court of Appeals noted that it is "more challenging for law enforcement agencies and courts to apply the particularity requirement in the digital world than in the physical world," and that "it can be difficult for officers to specify in advance the sections of the device that should be searched." *Richardson*, 282 A.3d at 108. The court distinguished between the "*how*" a search is to be done (noting that some judges have denied warrants for lack of a sufficient search protocol) and the "*where, what, and when*" of a search (noting that "the most common limitation that issuing judges should consider including in a warrant to satisfy the particularity requirement is a temporal restriction"). *Richardson*, 282 A.3d at 115–120 (emphasis in original). The court noted that, in general, "catchall" language effectively

56

permitting officers to seize all data on a cell phone or other electronic device renders a

search warrant invalid. *Richardson*, 282 A.3d at 119. The court concluded:

> While reasonable minds may differ at times on whether a warrant is
> sufficiently particular, one thing is clear: given the privacy interests at stake,
> it is not reasonable for an issuing judge to approve a warrant that simply
> authorizes police officers to search everything on a cell phone. Because that
> is what the search warrant did in this case, it violated the particularity
> requirement of the Fourth Amendment.

*Richardson*, 282 A.3d at 124.

¶105 The facts of this case line up much more closely with *Richards*, *Burgess*, *Adjani*,

and *McGovern* than with *Winn* or *Richardson*. The proper inquiry under *Seader* is whether

the warrant makes clear what items may or may not be seized. *Seader*, ¶ 12. What *Seader*

did not include, and where the cases above are more helpful, is a recognition that the

specificity analysis for digital evidence seized pursuant to a search warrant must be

context-specific and consider the reality of how digital data is actually stored and searched.

"[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v.

California*, 573 U.S. 373, 381, 134 S. Ct. 2473, 2482 (2014) (internal quotation marks

omitted); *see also Mefford*, ¶ 12.[1]

---

[1] The Court responds by focusing on the fact that several of the cases cited herein, *Richards*, *Adjani*, and *McGovern,* "concerned crimes which occurred on cell phones and search warrants tailored to that effect." Opinion, ¶ 65. However, not all of the cases cited herein concerned cell phone crimes, yet the governing principles applied nonetheless. And, while the Court's statement with regard to *Richards*, *Adjani*, and *McGovern* is technically accurate, those cases stand for the broader proposition that the specificity analysis must account for the realities of digital evidence on modern cell phones. This is not to suggest that search warrants for cell phones face a lower burden. The constitutional standard for particularity remains the same: the warrant must provide the executing officer with sufficient objective guidance so that he or she knows what items fall within the scope of the warrant and what items do not. *Seader*, ¶ 12. However, when applying *Seader* to modern digital evidence, the analysis should recognize that it is often impossible to draft a warrant that perfectly describes in advance the precise nature and location of every piece of

¶106   I would conclude that the District Court did not err by concluding the warrant here was sufficiently specific under the circumstances.   Although the warrant for Proctor's phone uses the phrase "all data," which could arguably be viewed as an improper catchall if used in isolation, here the language is expressly limited to only data "related to the crimes or offenses identified herein," and contained an inherent temporal restriction, which contrasts to general warrants like the one discussed in *Richardson*.   The crime charged was Aggravated Assault of P.P., who was only five months old at the time.   Any data predating the relevant period was therefore inherently excluded, adding a temporal limit to the warrant in contrast to *Winn*.   The officer executing the search warrant here could not "take everything," as they did in *Winn*.   *See Winn*, 79 F.Supp.3d at 922.

¶107   Additionally, as in *Adjani*, the warrant here was supported by a detailed affidavit that provided objective guidance to the officer executing the warrant.   The affidavit catalogued each of P.P.'s injuries, along with the NAT diagnosis, identified the specific dates on which P.P. presented at daycare with facial injuries, as well as the date on which her black eye was observed upon admission to St. Peter's Hospital.   The affidavit further noted specific types of app data, such as Owlet app data, and noted Proctor's heavy phone usage at the hospital immediately following P.P.'s life-altering diagnosis.   Relying on his

responsive evidence.   Though data on a smartphone is frequently intermingled with innocent information, a warrant that is expressly limited to evidence of a specific crime and supported by a detailed affidavit can still satisfy the specificity requirement even if it does not identify with absolute precision every responsive file or folder.   In my view, the Court in this case gives insufficient weight to two facts relating to specificity: (1) the warrant expressly limited the search to data "related to the crimes or offenses identified herein," and (2) the warrant was supported by a detailed affidavit that provided specific factual context and temporal boundaries.

training and experience, Detective Van Dyke opined that this conduct suggested the phone would contain relevant evidence of P.P.'s injuries, medical history, and care. The warrant identified a specific crime, the supporting affidavit supplied a relevant time frame and additional factual context, and together they provided an objective standard for "what items may or may not be seized" in this context. *Seader*, ¶ 12. The warrant for Proctor's phone did not authorize a free-ranging or exploratory search. *See McGovern*, 974 N.W.2d at 615; *Richards*, 659 F.3d at 541–42; *Burgess*, 576 F.3d at 1092. Under the facts and circumstances presented, the warrant met constitutional standards.

¶108 I would affirm the District Court on this issue.


/S/ JIM RICE


Chief Justice Cory J. Swanson joins in the specially concurring Opinion of Justice Jim Rice.


/S/ CORY J. SWANSON


Justice Katherine M. Bidegaray, concurring in part and dissenting in part.

¶109 I concur in the Court's conclusion that the October 28, 2021 warrant authorizing extraction and search of Proctor's cell phone data was an unconstitutional general warrant. I dissent, however, from the Court's conclusion that admission and use of the fruits of that warrant were harmless. I also dissent from the Court's refusal to review, under the plain error doctrine, the prosecutor's closing argument inviting the jury to judge Proctor by her "character" and by her decision to search for legal counsel while her child was

59

hospitalized. Finally, although I would reverse on Issues Two and Three and therefore need not resolve the Rule 702 issue definitively, I write separately to address a narrow reliability concern that this case illustrates and that may recur in future cases. I would not hold that nonaccidental-trauma (NAT) or abusive-head-trauma (AHT) testimony is categorically inadmissible. I write only to express concern that, where the State uses a shaking/acceleration-deceleration mechanism in the absence of clear impact evidence to prove causation and timing, the district court must require a reliability showing directed to that specific mechanism.

¶110 The Court holds that law enforcement obtained Proctor's phone data through an unconstitutional general warrant. It further recognizes that portions of the prosecutor's closing argument were improper. But the Court then affirms because it is satisfied, from its review of the record, that the State's remaining evidence was substantial enough to support the verdict without the tainted evidence. This Dissent does not question that the State presented serious evidence or that the jury could credit it. The point is narrower: under *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, appellate confidence in the remaining evidence does not answer whether the unconstitutional phone evidence, as actually used, might reasonably have contributed to the conviction. That is not the harmless error inquiry Montana law requires. Under *Van Kirk*, as to the warrant error, the question is not whether this Court believes the jury could have convicted without the tainted evidence; the question is whether the State has shown "there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction." *Van Kirk*, ¶ 47. On this record, the State has not made that showing.

60

**The warrant was unconstitutional, and the tainted evidence was not harmless**

¶111   Montana's Constitution protects "the people" against unreasonable searches, and separately protects individual privacy, including privacy in electronic data and communications; "no warrant . . . shall issue without describing the place to be searched or the person to be seized." Mont. Const. art. II, §§ 10, 11.  The particularity requirement is no mere drafting preference.  It ensures that "nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 76 (1927).   It prevents "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971); *State v. Seader*, 1999 MT 290, ¶ 11, 297 Mont. 60, 990 P.2d 180.  And in the digital context, the need for particularity is heightened because modern cell phones hold "the privacies of life." *Riley v. California*, 573 U.S. 373, 403, 134 S. Ct. 2473, 2494-95 (2014); *see also State v. Mefford*, 2022 MT 185, ¶ 15, 410 Mont. 146, 517 P.3d 210.

¶112   The warrant here authorized law enforcement to extract and download "[a]ll data currently stored in" Proctor's phone "related to" aggravated assault, "including but not limited to" GPS and location data, IP addresses, activity logs, contacts, calendars, photographs, audio and video files, metadata, email messages and attachments, documents, timeline history, public profiles, login history, browsing and search history, visited websites, text messages, instant messages, privacy settings, social-media profiles and conversations, financial and credit card account information, linked applications, Owlet data, and any data pertaining to P.P.'s health, injuries, or circumstances.  The only express exclusions were communications with legal counsel, clergy, and other agreed-upon

61

communications. This was not a narrow search for Owlet data from September 28-29. It was authorization to rummage through nearly every category of data a modern phone can contain.

¶113 I therefore agree with the Court that the warrant was "unlawfully overbroad and unparticularized." The warrant did not enable executing officers to distinguish what could and could not be seized. *Seader*, ¶ 14. Instead, it left the scope of the search to law enforcement's discretion. That is the constitutional evil the particularity requirement forbids.

¶114 The Special Concurrence would uphold the warrant because it referenced aggravated assault and because P.P. was only five months old. I cannot agree that an "inherent" time frame or a general offense label can substitute for objective limits in the warrant itself. The application established, at most, a focused nexus to Owlet data, communications, photographs, or records bearing on P.P.'s health, care, injuries, or the circumstances of those injuries during a defined period. The warrant instead authorized nearly every category of phone data, including financial account information, public profiles, login history, browsing history, privacy settings, and linked applications, and did so "including but not limited to" the listed categories. A warrant remains general when the line between what may and may not be seized depends on the executing officer's after-the-fact judgment about what is "related" to a broad suspected offense.

¶115 I part ways with the Court on harmless error. The Court treats the tainted phone evidence as a series of isolated, cumulative items: photographs of P.P.'s bruises and abrasions, web-history evidence showing Proctor searched for defense counsel, two text

messages to Tim, and Pinterest activity. That approach reverses the inquiry. *Van Kirk* requires comparison between the tainted evidence and admissible evidence that proved the same facts; it does not ask whether the rest of the record could support conviction. But the State did not use those pieces in isolation. It wove them into the central narrative of guilt: that Proctor had abused P.P. over time, that the acute brain injury was part of that pattern, and that Proctor's conduct after hospitalization revealed consciousness of guilt and bad character.

¶116 The cell phone photographs were not merely cumulative of testimony that P.P. had marks on her face. The relevant *Van Kirk* question is not merely whether witnesses also described bruises. It is whether admissible evidence proved the same facts, with comparable qualitative force, as the phone photographs. It did not. The State displayed and argued them as visual proof of a "pattern" of abuse beginning when P.P. was only weeks old. It used them in opening, in its case-in-chief, and in closing. Visual evidence of injuries to an infant carries a force different in kind from testimony that a witness observed a bruise or abrasion. The photographs supplied a visual chronology from which the State argued an escalating pattern of abuse beginning weeks after birth. They allowed the State to transform isolated observations of marks into a narrative of continuing abuse culminating in the catastrophic brain injury. The State then used those photographs to elicit medical testimony that one of the images depicted an injury the pediatrician had "never seen" in a one-month-old and that would have led her to admit P.P. for an abuse workup. That evidence did more than prove "bodily injury" as opposed to "serious bodily injury."

63

It invited the jury to infer that the later catastrophic injury was part of an ongoing course of abuse.

¶117 The web-history evidence was more prejudicial still. The Court reasons that the attorney-search evidence was cumulative because the jury otherwise heard that Proctor had counsel in October 2021. But there is a meaningful difference between neutral evidence that counsel later became involved and the State's use of unlawfully obtained search history to argue that Proctor was "looking for a defense attorney while her daughter is dying." Those are not the same facts, and they do not carry the same qualitative force. The former shows ordinary litigation activity after a family was under investigation; the latter invites the jury to treat contemporaneous counsel-seeking as consciousness of guilt and deficient maternal character. The tainted evidence supplied timing, context, and rhetorical force. It allowed the State to transform the exercise of prudence—seeking legal advice when CPS, law enforcement, and medical providers were treating the case as suspected abuse—into evidence of selfishness, bad character, and guilt.

¶118 Similarly, the text messages and web-history testimony were not harmless. The State elicited that, during P.P.'s hospitalization, Pinterest activity and searches for defense attorneys "stood out" in Proctor's phone history. It then used the texts and attorney-search evidence to portray Proctor's behavior as abnormal during a medical crisis. It argued not simply that Proctor behaved differently than others might have behaved, but that her behavior revealed "what the defendant's character is." The cell phone evidence gave the prosecutor the evidentiary hook for that improper moral argument.

¶119 The Court's harmlessness analysis also gives insufficient weight to the State's own use of the evidence. Evidence that the State repeatedly uses in opening, witness examination, and closing to advance a pattern-of-abuse and consciousness-of-guilt theory cannot fairly be dismissed as insignificant after conviction. The State chose to present the phone evidence because it believed the evidence would help persuade the jury. That choice matters in assessing whether there is a reasonable possibility the evidence contributed to the verdict.

¶120 Finally, the Court's harmless error analysis conflicts with *Van Kirk*. The Court repeatedly relies on the strength of the State's remaining evidence to excuse the taint of the cell phone data. But *Van Kirk* explicitly rejected the "overwhelming evidence" test. *Van Kirk*, ¶ 43. The State cannot satisfy its burden merely by showing that admissible evidence might have been sufficient to convict. It must show that the tainted evidence did not contribute to the conviction. *Van Kirk*, ¶ 47. This may have been a case in which the jury could convict on admissible evidence; that is not the test. We cannot ignore the State's own on-the-record concession during a pretrial motions hearing that "our case is highly circumstantial. It is entirely circumstantial." The State cannot lean on selected and visually powerful cell phone photographs of a bruised infant to bridge the gaps in its circumstantial timeline and then claim on appeal that the evidence was overwhelming anyway. In a case where medical causation, timing, and identity were fiercely disputed, the State has not carried its burden to prove the fruits of the unconstitutional warrant were harmless.

65

**The prosecutor's argument compounded the constitutional error and warrants plain error review**

¶121    The prejudice of the unconstitutional search did not end with the mere admission of the tainted evidence.  The prosecutorial misconduct issue cannot be separated from the warrant issue.  The State obtained Proctor's phone data under a general warrant, introduced evidence that she searched for defense counsel, and then argued that search to the jury as evidence of her character and guilt.  The constitutional injury was not complete when the search occurred.  It was amplified when the State used the fruits of the search to invite an inference no criminal trial should permit.

¶122    We review unpreserved claims of prosecutorial misconduct under the common law plain error doctrine when the claimed error implicates a fundamental right and failure to review may result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the trial, or compromise the integrity of the judicial process.  *State v. Deveraux*, 2022 MT 130, ¶ 21, 409 Mont. 177, 512 P.3d 1198; *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996).  A criminal defendant's right to a fair trial is guaranteed by the Sixth Amendment and by Article II, Section 24, of the Montana Constitution.  Prosecutorial misconduct warrants reversal when it deprives the defendant of a fair and impartial trial.  *State v. Haithcox*, 2019 MT 201, ¶ 24, 397 Mont. 103, 447 P.3d 452; *State v. Byrne*, 2021 MT 238, ¶ 18, 405 Mont. 352, 495 P.3d 440.

¶123    The prosecutor's argument crossed that line.  She told the jury that "when people are under pressure . . . their character really comes out."  She then invoked her own diligence in preparing the case:  "That's my character.  That's what the State is bringing to

this." She immediately contrasted that asserted character with Proctor's: "And you know what the defendant's character is?" The answer was the tainted phone evidence—Proctor's text messages and her search for a defense attorney. The prosecutor argued that Proctor "looked for a defense attorney" while her daughter was dying and that she used her resources "for herself to get a defense attorney."

¶124 This was improper in at least three respects. First, it invited the jury to convict on general bad character rather than on proof beyond a reasonable doubt of the charged offense. *See State v. Lake*, 2022 MT 28, ¶ 32, 407 Mont. 350, 503 P.3d 274. The prosecutor did not confine herself to rebutting a particular trait placed in issue by the defense. She argued that Proctor's "character" was revealed by her response to crisis and by her search for counsel. That is precisely the kind of propensity-based reasoning our rules of evidence and due process principles guard against.

¶125 Second, the prosecutor improperly placed her own character and credibility before the jury, engaging in an improper personal credibility argument. A prosecutor may argue the evidence and reasonable inferences from it; she may not use the prestige of her office or her own personal qualities as a measure against which the jury should judge the defendant. *See State v. Hayden*, 2008 MT 274, ¶ 33, 345 Mont. 252, 190 P.3d 1091. By telling jurors "That's my character. That's what the State is bringing to this," the prosecutor made herself a moral comparator. We have reversed where a prosecutor's closing argument added the force of the prosecutor's personal, professional, and official influence to the evidence and created a clear danger that jurors adopted the prosecutor's views rather than their own independent judgment. *Hayden*, ¶ 33. The same danger is

present when the prosecutor expressly contrasts her own "character" with the defendant's and asks the jury to view that contrast as meaningful evidence. In an entirely circumstantial case, this tactic risked adding the prosecutor's personal, professional, and official influence to the evidence and distracting the jury from the State's burden to prove guilt beyond a reasonable doubt.

¶126 Third, and most serious, the prosecutor invited the jury to infer guilt from Proctor's search for counsel. Courts have repeatedly recognized the danger of that inference. The Connecticut Supreme Court has explained that evidence of a criminal defendant's consultation with counsel is "highly prejudicial" because it tends to suggest that the defendant is, or believes herself to be, guilty. *State v. Angel T.*, 973 A.2d 1207, 1220-22 (Conn. 2009). To infer consciousness of guilt from seeking counsel is "illogical and unwarranted." *Angel T.*, 973 A.2d at 1221 n.15 (citation omitted). Other courts have reached the same conclusion when prosecutors invite jurors to treat a request for counsel as incriminating. *See Commonwealth v. Lang*, 275 A.3d 1072, 1081-85 (Pa. Super. Ct. 2022). Seeking legal advice is equivocal at best; an innocent person facing investigation into catastrophic injuries to her child may reasonably seek counsel precisely because the stakes are grave and the process is unfamiliar. Allowing a prosecutor to turn a preemptive search for counsel into evidence of guilt threatens the fairness of the trial itself. If citizens cannot research legal representation during a CPS and law enforcement inquiry without it being introduced as consciousness of guilt, the integrity of the judicial process is deeply compromised.

¶127   I would not decide this case on whether the Sixth Amendment right to counsel had formally attached at the moment Proctor searched for an attorney.   The problem is more basic.   Absent a legitimate non-propensity purpose that survives relevance and unfair-prejudice review, the State may not invite jurors to treat a person's effort to obtain legal advice during a CPS, medical, and law-enforcement investigation as evidence of guilt, consciousness of guilt, or bad character.   *See* M. R. Evid. 401, 403, 404(a)(1), 404(b); *Lake*, ¶ 32; *Angel T.*, 973 A.2d at 1220-22; *Lang*, 275 A.3d at 1081-85.   The constitutional problem is especially acute here because the State used unlawfully obtained digital evidence to make the argument.

¶128   The Court acknowledges that the prosecutor's comments were improper and "disturbing," but it declines plain error review because it concludes the evidence was overwhelming.   That reasoning again substitutes appellate confidence in the State's case for the correct inquiry.   Plain error review asks whether failure to review may leave unsettled the fairness of the proceedings or compromise judicial integrity.   *Deveraux*, ¶ 21. When the prosecutor uses the fruits of an unconstitutional general warrant to tell jurors that a defendant's search for counsel reveals bad character and guilt, the integrity of the proceeding is necessarily implicated.

¶129   I do not conflate the harmless error and plain error inquiries.   The State bears the burden to prove harmlessness of the warrant error; Proctor bears the burden to justify plain error review of the unpreserved misconduct.   On this record, both inquiries point in the same direction because the same tainted evidence supplied the prosecutor's improper character and counsel-based argument.   That overlap does not merge the standards; it

explains why failure to review the misconduct leaves the fairness and integrity of the proceeding unsettled after the Court has already identified the underlying search as unconstitutional.

¶130   This was not an isolated misstatement in a lengthy trial.  The challenged argument came at the end of the case, when jurors were being told how to interpret the evidence.  It joined the State's themes:  pattern of abuse, abnormal maternal response, consciousness of guilt, and bad character.  No contemporaneous objection was made, and therefore no curative instruction specifically addressed the argument.   The absence of a curative instruction is not alone dispositive, but it matters when the argument struck directly at a constitutionally protected choice and at the jury's proper role.

¶131   The State's case, moreover, was not a case of direct proof.  No witness saw Proctor shake, strike, or otherwise injure P.P.  The causation and timing evidence were contested.  The defense presented medical evidence disputing the State's diagnosis and pointing to alternative explanations that, if credited, would undermine the State's timeline.  The State's "last caregiver" theory depended on disputed medical testimony about immediate symptoms and on inferences about Proctor's emotional state and conduct.  In that context, improper character and counsel-based arguments carried substantial risk.

¶132   I would hold that the prosecutor's argument, considered together with the admission of the tainted phone evidence, denied Proctor a fair trial.  At minimum, it required this Court to exercise plain error review.  On review, I would conclude the misconduct, combined with the unconstitutional admission and use of the cell phone evidence, requires reversal of the conviction.

**The errors were cumulative and mutually reinforcing**

¶133   The Court analyzes the warrant evidence and prosecutorial misconduct separately. That separation of issues misses how the trial unfolded. The State's phone evidence and argument reinforced one another. The warrant produced photographs, texts, Pinterest activity, and attorney-search history. The State used those items to build a narrative that Proctor had abused P.P. over time, responded abnormally when P.P. was gravely ill, and sought counsel because she was guilty. The prosecutor then framed that narrative as a question of "character."

¶**134**   The cumulative effect matters. A general warrant allowed the State to reach deep into Proctor's digital life. The State then used the fruits of that unconstitutional search not merely to prove discrete facts, but to invite moral condemnation and guilt-based inference from counsel-seeking. Each error magnified the other. Even if one could call a single photograph or text message cumulative in isolation, the State's use of the phone evidence in closing—as proof of a pattern of abuse, abnormal maternal response, bad character, and guilt from counsel-seeking—precludes a finding that the warrant error was harmless. That same counsel- and character-based argument leaves the fairness and integrity of the proceedings unsettled.

¶135   Our constitutional guarantees are not satisfied by identifying serious error and then affirming because we believe the defendant probably would have been convicted anyway. The harmless error doctrine is not a license to excuse the State's use of unconstitutional evidence whenever the remaining record is substantial. *Van Kirk* places the burden on the

State to show no reasonable possibility of contribution to the conviction. The State has not met that burden.

**Rule 702 concern**

¶136 Because the unconstitutional warrant and the subsequent prosecutorial misconduct are sufficient reasons why I would reverse the conviction, I need not decide whether the District Court's Rule 702 ruling independently requires reversal. I write separately, however, because the State's timing theory depended materially on a contested shaking/acceleration-deceleration mechanism in the absence of clear impact evidence, and that evidentiary issue is likely to recur in future cases. I would not hold that NAT or AHT testimony is categorically inadmissible. My concern is narrower: when the State uses a shaking/acceleration-deceleration mechanism, in the absence of clear impact evidence, to establish both causation and timing, the district court must require a reliability showing directed to that specific mechanism.

¶137 M. R. Evid. 702 requires the district court to act as gatekeeper. The court must determine whether expert testimony will assist the trier of fact, whether the field or method is reliable, and whether the witness is qualified. *State v. Clifford*, 2005 MT 219, ¶ 28, 328 Mont. 300, 121 P.3d 489; *Wheaton v. Bradford*, 2013 MT 121, ¶ 16, 370 Mont. 93, 300 P.3d 1162. Cross-examination is an important tool, but it is not a substitute for the court's threshold reliability determination.

¶138 I would not hold that physicians may never diagnose nonaccidental trauma. Nor would I hold that all testimony using the terms AHT or NAT is inadmissible. But the State's theory at trial was not merely that P.P.'s injuries were nonaccidental. The State

72

presented a shaking/acceleration-deceleration theory, in the absence of clear impact evidence, as the explanation for P.P.'s brain injury. That theory was central to timing and identity: if that mechanism would make P.P. immediately symptomatic, then the jury could infer the injury occurred during the window when the State alleged Proctor was alone with P.P. If the mechanism or timing premise is unreliable, the State's circumstantial chain weakens substantially.

¶139 The District Court's oral ruling did not meaningfully separate a broad NAT diagnosis from the specific contested shaking/acceleration-deceleration mechanism the State relied on in the absence of clear impact evidence. The court stated that the defense had "raised an issue" for the factfinder, that it had not heard anything showing the "science is unreliable," and that the jury should decide. Respectfully, that ruling conflates the court's preliminary gatekeeping responsibility with the jury's ultimate role as factfinder. Rule 702 requires the trial court to determine whether the expert field or method is reliable *before* the jury weighs the evidence. *Clifford*, ¶ 28; *Wheaton*, ¶ 16. If the State's timing theory depends materially on the premise that shaking or acceleration/deceleration without clear external impact causes immediate symptoms, the scientific reliability of that specific biomechanical mechanism is a threshold admissibility question, not merely a question of weight.

¶140 The supplemental authority filed after briefing underscores the point. In *State v. Nieves*, 345 A.3d 1127, 1165-72 (N.J. 2025), the New Jersey Supreme Court held that the State failed to establish the reliability of SBS/AHT testimony premised on shaking without impact. *Nieves* is not controlling, and it arose under New Jersey law. But

73

it is persuasive for the narrower proposition relevant here: when the State seeks to prove a contested shaking mechanism absent clear impact evidence, the court must require a reliability showing directed to that mechanism, not merely to the general proposition that child abuse occurs or that physicians may diagnose NAT.

¶141 In a future case, when the State seeks to offer testimony that shaking/acceleration-deceleration in the absence of clear impact evidence caused injury or that such a mechanism establishes timing, the district court should conduct a focused Rule 702 inquiry. The State should be required to establish that the specific scientific proposition offered to the jury is reliable before disputes over its application to the facts are submitted to the jury.

**Conclusion**

¶142 I concur in the Court's holding that the October 28, 2021 phone warrant was an unconstitutional general warrant. I dissent from the Court's conclusion that the admission and use of the warrant's fruits were harmless. I further dissent from the Court's refusal to review and remedy the prosecutor's improper argument equating Proctor's search for counsel with bad character and guilt. In a case the State itself conceded was entirely circumstantial, the State has not demonstrated that there is no reasonable possibility that the tainted phone evidence contributed to the verdict. And because the State then used that evidence to invite improper character and counsel-based inferences, the failure to review the misconduct leaves the fairness and integrity of the proceedings unsettled. I would therefore reverse Proctor's conviction.

¶143   I respectfully concur in part and dissent in part.


                                    /S/ KATHERINE M. BIDEGARAY


Justices Ingrid Gustafson and James Jeremiah Shea join in the concurring and dissenting Opinion of Justice Katherine M. Bidegaray.


                                    /S/ INGRID GUSTAFSON
                                    /S/ JAMES JEREMIAH SHEA